30558, 30559. WESSNER v. THE STATE (two cases).

UNDERCOFLER, Presiding Justice.

Matthew Wessner was convicted of the murders of his former wife, Linda Wessner, and George Kistemaker, III. The murders occurred on February 9, 1975. He was sentenced to serve two concurrent life sentences. The defendant contended that he was insane at the time he killed Kistemaker and that the shooting of his former wife occurred because of accident or because he was insane at the time.

The evidence shows that the Wessners had been married about ten years and had two children; that they had experienced marital problems caused by the relationship of Mrs. Wessner with Kistemaker, over a period of two to three years; and that the marriage was dissolved by a divorce granted on January 16, 1975. As a result of marital problems, the defendant entered the

Bradley Center, a private psychiatric hospital, in Columbus from October 1974, until late November 1974. Mrs. Wessner entered that hospital from November 1974, until January 1975. The defendant was again admitted to the hospital following a suicide attempt on January 14, 1975, and remained there until he was granted a pass on the weekend of the homicides.

The evidence shows further that in May 1973, a security guard at a named motel heard a noise in the hallway and on investigation observed Kistemaker against a wall and the defendant walking out the door. Kistemaker had several knots on his forehead and the middle knuckle of defendant's hand was swollen.

The defendant told his brother-in-law on several occasions that he hated Kistemaker; that he had purchased a gun and was going to kill him; that at one time he had Kistemaker in his gunsight and followed him for a distance but changed his mind about shooting him at that time because it was too easy and he could kill him any time he wanted to; and that if he ever found his wife and Kistemaker together again he would kill both of them.

One witness, a neighbor and friend of Mrs. Wessner, testified that she and Mrs. Wessner had met with other men while they were married to their husbands; that on one occasion, under the pretext of going somewhere else, their husbands had placed a tape recorder in the car and had taped their conversation as they went to meet her boy friend and Kistemaker. Mrs. Wessner was forced at gunpoint to listen to the tape recording; that the defendant again threatened Kistemaker's life and told Mrs. Wessner, "I'll kill George Kistemaker and I'll kill you too, and I'll get away with it; I'll plead insanity." The husband of the witness told the witness that he could kill her too and "get out of it" on the ground of insanity. The threats against Mrs. Wessner and the witness were contradicted by the witness' former husband. The witness heard the defendant threaten to kill Kistemaker several times.

The defendant told Kistemaker's grandmother that, "I've got it in my mind just to kill them both."

A police officer testified that in September 1974, he responded to a call and talked with Kistemaker. As a

result of this conversation, he stopped an automobile occupied by the defendant and another person. The defendant had the loaded murder weapon with him on the front seat of the car, the defendant had a permit to carry the gun, the officer unloaded it and returned it to him.

In January 1975, a secretary in a real estate office testified that the defendant listed his home for sale with them; that she talked with him for about 30 minutes; and that she was of the opinion that he knew right from wrong.

Another witness, a student in psychiatric nursing, testified that she was present at Bradley Center on February 6, 1975, when the defendant requested a weekend pass; she knew from her experience with the defendant that he hated his wife; that he said on requesting the pass, "I have a weapon and I'm just waiting for the right circumstance." The attending psychiatrist stated to the defendant, "We'll just have to work on eliminating the circumstance." The defendant was granted a pass a day at a time for the weekend of the homicides.

Another witness, an 18 year old former patient of Bradley Center and a former drug abuser, met the defendant and Mrs. Wessner at the Center. Mrs. Wessner asked her to spend the night with her on February 8, 1975. The witness, her boy friend, Mrs. Wessner and Kistemaker were together until 3:00 a.m. on February 9, when the witness' boy friend went home and the witness went to bed. Mrs. Wessner and Kistemaker were seated on the couch at that time. About 12:30 p.m. February 9, 1975, the witness was awakened by a loud crash coming from the area of the front door. She heard gunshots, heard Mrs. Wessner scream, "Matt is here," and the witness hid under the bed. She heard Mrs. Wessner run into the room where she was hiding and hide in the closet. The defendant came into the room, found Mrs. Wessner, and she heard Mrs. Wessner scream, "Don't Matt, Peggy is here. For God's sake, Matt, think about the kids, don't do this. . . If you really loved me, you wouldn't be doing this." The defendant said, "I do love you." Mrs. Wessner said, "If you want me to come back to you, Matt, I'll come back to you if that is what you want." These remarks were made as they were leaving the room. The witness heard more

gunshots, heard the defendant call for an ambulance and then leave the house. The witness went into the kitchen, saw the bodies, and went to her own home.

The police officers arrived about 1:30 p.m. and found the victims barely alive. Kistemaker had been shot twice in the back of the head and once in the body. Mrs. Wessner had been shot twice. They died of the gunshot wounds.

The defendant's brother testified that the defendant came to his home about 10:00 a.m. on February 9, 1975, called his former wife, arranged with her to take their children to church, changed his clothes and left the house. He returned with his children at approximately 12:30 p.m. bringing some steaks for lunch; he left immediately though to get some steak sauce; about 15 minutes later he returned to his home in an obviously upset condition and said, "I have just shot Linda and George; I am going to Hell." The brother took the murder weapon and gave it to the police. The murder weapon was the same pistol which the defendant had previously requested his brother to sell for him and which the brother the previous night had placed in his kitchen cabinet. The brother called the police, the doctors, and a lawyer.

The arresting officer testified that in his opinion, based on his conversation and observation of the defendant immediately after the shooting, the defendant knew right from wrong.

The investigating officer testified that he did not tell the defendant that his wife had died until his doctor had come to the jail; that the defendant was very remorseful and told him that he had his wife's "blood on him" and that he was going to hell for what he had done. He testified that in his opinion the defendant knew right from wrong.

*Held:*

1. The attending psychiatrist testified that for seven to ten days before the homicides he was in charge of the appellant's case at the Bradley Center and that he interviewed him on two occasions after the homicides. He testified that the appellant was taking a major tranquilizing drug to relieve his anxiety and to benefit his depression.

The appellant contends that the trial court erred in refusing to allow the attending psychiatrist to answer his

hypothetical question of whether the appellant knew right from wrong based on the subjective facts related to him by the appellant. The record shows that the attending psychiatrist testified that based on objective facts, the appellant did not know right from wrong. He also testified on cross examination that the appellant did not know right from wrong based on subjective facts.

The trial court ruled that the attending psychiatrist could not answer the hypothetical question based on the subjective facts related to him by the appellant. The ruling of the trial court, if error, was harmless. The attending psychiatrist testified that the appellant did not know right from wrong based on objective facts and based on subjective facts.

2. The appellant contends that the trial court erred in failing to give his written request to charge the entire Code Ann. § 27-1503 (Acts 1952, p. 205; 1972, p. 848) dealing with acquittal because of insanity.

In *Pierce v. State,* 231 Ga. 731 (5) (204 SE2d 159) (1974) this court said: "The provisions of this section require, in all criminal trials wherein an accused contends he was insane or mentally incompetent at the time the acts charged against him were committed, that the trial judge instruct the jury to specify in their verdict that an acquittal on account thereof is because of such insanity or incompetency. The Code section contains other provisions relating to the duty of the judge in such instances and also deals with the hospitalization of the accused. It would be inappropriate to give the entire section in charge to the jury and the trial court properly did not do so."

There is no merit in this contention of the appellant.

3. On direct examination, a witness for the state testified that when the appellant requested a weekend pass from the hospital he stated that he had a weapon and was waiting for the right circumstance. She testified that the attending psychiatrist stated: "We'll just have to work on eliminating the circumstance." Subsequently the attending psychiatrist testified. Later during the testimony of the defendant, the trial judge noticed that the attending psychiatrist was in the courtroom after the sequestration rule had been invoked and asked counsel

for the appellant if he intended to have him testify. Counsel for the appellant stated to the court that they did not intend to recall the attending psychiatrist.

Counsel for the appellant then sought to recall the attending psychiatrist to the stand. An objection to the recall was sustained. This enumeration of error contends that the trial court committed reversible error in its ruling.

There is no merit in this contention. The trial court is vested with a discretion in the enforcement of the sequestration rule. *Jarrell v. State,* 234 Ga. 410 (6) (216 SE2d 258) (1975).

4. The appellant filed an extraordinary motion for new trial on the basis that the state had withheld material evidence which would have been helpful to his defense, and that the evidence was not merely cumulative or impeaching in character.

At the hearing on the motion, the evidence showed that the investigating officer found a small quantity of suspected marijuana in a plastic bag in the bedroom of the deceased Mrs. Wessner; that the marijuana was either in a jewelry box on top of the chest of drawers or in one of the drawers; that it was in an amount sufficient to make one "reefer"; that all the ashtrays, garbage cans, etc., were checked and there was no smell of marijuana in the house which might indicate that it had been smoked; the marijuana was destroyed by an officer; no written report was made of it; and the officers were not certain that they made a verbal report to the district attorney of its find.

Since the investigating officer testified that there was no evidence of the smoking of marijuana in the house, this court fails to see how the appellant was harmed by the finding of marijuana in a jewelry box on top of the chest of drawers or in one of the drawers in the deceased woman's bedroom. This is especially true in this case where the appellant pled insanity at the time of the homicide of Kistemaker and insanity or accident in connection with the homicide of his former wife.

*Judgments affirmed. All the Justices concur.*

ARGUED JANUARY 12, 1976 — DECIDED
FEBRUARY 2, 1976.

168

*Frank K. Martin, William L. Tucker, Martin, Kilpatrick & Davidson,* for appellant.
*E. Mullins Whisnant, District Attorney, William J. Smith, Assistant District Attorney, Arthur K. Bolton, Attorney General, Kirby G. Atkinson, Staff Assistant Attorney General,* for appellee.