*P. Samuel Huff,* for appellee.

36851. JORDAN v. THE STATE.

PER CURIAM.

This murder/mutiny case involves the 1978 riot and attempted prison break at Georgia State Prison in Reidsville, Tattnall County, Georgia, which left two inmates and a guard dead and another guard seriously injured. See *Whitaker v. State,* 246 Ga. 163 (269 SE2d 436) (1980), involving the same occurrence.

The disturbance, an eruption of racial tensions, commenced shortly after 4:00 p.m. Sunday, July 23, 1978. At that time, the two buildings involved, buildings A and B, each contained four dormitories (1 and 2 at ground level and 3 and 4 on the second floor). Pursuant to court order, Dorms A-1 and B-3 housed white inmates and Dorms A-2, A-3, A-4, B-1, B-2 and B-4 housed black inmates. Each dorm housed about 60 inmates.

Guard Preston Foskey, who was in charge of B-1 and B-2 dormitories, released four or five orderlies for an early evening meal from B-1. As he was doing so, he was grabbed from behind and dragged inside the dorm by one or more inmates. He was pulled into the bathroom and stabbed by inmates using homemade weapons. He ran from the bathroom area, into the hall where inmates stabbed him again and again. He was knocked to the floor. When he regained consciousness, the inmates had gone and he ran to safety.

Hearing a disturbance and seeing inmates from B-1 and B-2 in the hall, a guard at A building, Dan Harrison, came to investigate. He was stabbed repeatedly, kicked, beaten and physically abused after he had fallen to the floor from the repeated stabbings.

Inmates, now in possession of both Harrison's and Foskey's keys, released approximately 240 inmates. The inmates took mattresses off beds and set them on fire, killed two inmates, and tried to persuade other inmates to release a guard these inmates had given asylum in A-3 dormitory. Homemade weapons were abundant.

After smoke had obscured much of the prison and it had become obvious that riot guards would soon be coming to settle the disturbance with tear gas, inmates congregated at A-2 dormitory where they barricaded themselves in.

The defendant and another inmate, Jessie Whitaker, negotiated a settlement on behalf of the inmates. Prison officials directed the inmates to strip and their clothing was searched for weapons before the inmates returned to their assigned dorms. The riot had lasted

over 2 hours.

After the riot had ended, prison authorities collected the clothing and more than 40 homemade weapons. Foskey was immediately rushed to the hospital where he spent twelve days recuperating from over 30 stab wounds and collapsed and punctured lungs. Harrison and the two inmates killed during the riot were dead by the time the riot was quelled. Autopsy indicated that Harrison had received more than 50 wounds over his body from different instruments and had ultimately bled to death from seven stab wounds which had penetrated his chest, lungs and liver.

Prison officials and investigators from the Georgia Bureau of Investigation interviewed inmates in an attempt to determine which inmates were responsible for the riot and the murders. After about 2 or 3 weeks of investigation, officials compiled a list of 29 suspects and ultimately charged 6 inmates with criminal activity.

The defendant was one of these 6 inmates. He apparently was moved from Georgia State Prison on or about July 28, 1978, and was subsequently charged with the murder of guard Dan Harrison, the aggravated assault of surviving guard Preston Foskey, and mutiny in a penal institution. He was indicted on April 5, 1979, after previous indictments were quashed for illegal jury composition, and pleaded not guilty at arraignment in Tattnall County Superior Court on April 17, 1979. Co-participant Jessie Whitaker was the first inmate to be tried. He was convicted of three counts of murder, and one count each of simple battery and simple assault.[1]

After consideration of numerous pretrial motions throughout the summer and two and one-half days of jury selection, defendant's trial commenced on August 13, 1979, in Tattnall County.

At trial, the prosecution presented 11 witnesses, including the Administrative Assistant to the Warden at the time, surviving guard Foskey, the Director of the State Crime Laboratory, who had performed an autopsy on the murdered guard, and 8 inmate witnesses.

The Warden's Administrative Assistant gave a general description of the prison layout and the conditions he saw when he came to the prison shortly before the riot ended. Foskey related the events that led up to his being stabbed but he could not identify who had stabbed him.

The prosecution evidence directly connecting the defendant with the stabbing of the two guards came from 8 inmates. Inmate

---

[1] One of the remaining four inmates was acquitted and the indictments against the other three were ultimately dismissed.

Tommy Stroud testified that he had seen the defendant grab and stab both Foskey and Harrison. Inmate Frank Smith saw the defendant stab the deceased Harrison. Inmates Charles World and James Dickey testified that they had seen the defendant grabbing or fighting both guards but had not seen him stab them. Inmates Stroud, World and Dickey testified that the defendant was the first inmate to grab Foskey. Inmates Joseph Boyd and R. V. Gerdine testified that they had seen the defendant washing off a bloody weapon and Boyd testified that he was wearing blood-soaked clothing. Inmate Gerdine also testified that defendant had told his dormitory that he'd just taken care of two "pigs" and they'd better arm themselves. Defendant also told inmate Herbert Willingham's dorm to arm themselves. Inmate Henry Campbell testified that defendant had directed the inmates in dormitory A-3 to kill Frankie Wells, the guard they were protecting.

Defense cross examination was directed primarily at impeaching the inmates' testimony on several grounds, including: (1) the inmates had gained a highly prized transfer from Georgia State Prison, allegedly in return for their fabricated testimony; (2) their present testimony was impeached by prior inconsistent statements; and (3) inferences that the prosecution's inmate witnesses were parties to planning and executing the riot and were testifying to divert the investigators' attention from their own guilt.

The defense presented testimony from about 26 witnesses, including 22 inmates. These witnesses were primarily used to support the defendant's contention that he was being singled out in retaliation for acting as a spokesman for the inmate population, and to attack the credibility of the prosecution's inmate witnesses. Sixteen of the defense inmates testified as to the lack of credibility of one or more of the state's witnesses.[2] Five inmates testified that they saw defendant without blood on his clothes and without a weapon,[3] three testified that defendant acted throughout the riot to calm the inmates,[4] one said defendant had not been involved in the stabbings,[5] and one said defendant did not tell the inmates to get out of their

---

[2] Jordan Garvin, Eddie Lee Johnson and Albert Burnett (R. V. Gerdine); Jerry Scott, Johnny Bethany, Dwight Lindsey, and Joseph Williams (Charles World); Eddie Harris, John Lewis, and Charles Bailey (Henry Campbell); Tommy Wimberly, R. V. Freeman and Harry Wood (Tommy Stroud); Tommy Wimberly (Herbert Willingham); Willie Shears (Joseph Boyd); R. V. Freeman, Christopher Peek (Frank Smith).

[3] Trent Gould, James A. Robinson, Jordan Garvin, Robert Turner, and Johnny Rowland.

[4] Tommy Wimberly, Clarence Baker, and Nathaniel Jones.

[5] Tommy Wimberly.

dorms.[6] Prison correctional officer Jay Kries did not see blood on defendant while he was acting as spokesman for the inmates and guard George Smith did not see defendant mistreat Foskey or Harrison.

The jury found the defendant guilty of murder (Code Ann. § 26-1101), not guilty of aggravated assault, and guilty of mutiny in a penal institution (Code Ann. § 26-2507) on August 16, 1980. They refused the state's request for the death penalty although they found four aggravating circumstances. Code Ann. § 27-2534.1 (b) (7), (8), (9), (10). Defendant was sentenced to life imprisonment for murder and five years imprisonment for mutiny in a penal institution to be served consecutively to each other and any former sentences. A motion for new trial was denied and defendant appeals.

1. Defendant contends the trial court erred in refusing to conduct a full evidentiary hearing on his pretrial motion to dismiss for governmental misconduct.

On April 17, 1979, the six indicted inmates filed a motion to dismiss the criminal charges for governmental misconduct. They contended the state had engaged in the following alleged acts: physically abused the defendants and prospective witnesses; at all times manipulated the news media to the detriment of the defendants and the black inmate population; operated Georgia State Prison in such a manner as to exacerbate racial tension (such as by discriminatory hiring practices, including employing racially prejudiced white guards who supplied white inmates with weapons); deprived inmates of meaningful programs; allowed easy availability of alcohol and other drugs; and refused to take necessary steps to avoid the riot in this case. Defendants contended that the indictments against them should be dismissed for violation of their rights to due process and equal protection and against cruel and unusual punishment. The trial court denied the pretrial motion without allowing defendant to present evidence concerning conditions at the prison at the time of the riot, although some such testimony was given at trial and at the hearing on defendant's motion for new trial.

The Civil Practice Act is applicable to civil cases. Code Ann. § 81A-101. Even with notice pleading, civil cases are subject to disposition by judgment on the pleadings. Code Ann. § 81A-112 (c). Pleadings in criminal cases are not subject to the Civil Practice Act; they are subject to our code on criminal procedure, Code Title 27, esp.

---

[6] Tommy Stone.

Chs. 15 and 16, and the decisions relating thereto. Demurrers, pleas and motions attacking indictments must set forth the defect in the indictment or the ground of the motion to dismiss with particularity. See 7 EGL Criminal Procedure, §§ 40-42. We therefore treat defendant's motion to dismiss the indictment for alleged governmental misconduct as being complete on its face. When so considered, it fails to show grounds for dismissal of the indictment.

Each of the various allegations of defendant's motion has been examined. Each of them which has any merit would be subject to an action for relief short of dismissal of the indictment. See 42 USCA § 1983; Streeter v. Hopper, 618 F2d 1178 (5th Cir. 1980); Guthrie v. Caldwell, C. A. 3068 (S. D. Ga.); Code Ann. § 27-1201.

Remedies should be tailored to the injury suffered from the constitutional violation alleged and should not unnecessarily result in dismissal of the indictment where the criminal proceeding can proceed with full recognition of defendant's right to a fair trial. See United States v. Morrison, —— U. S. —— (—— SC ——, 66 LE2d 564) (1981); see also *Strong v. State,* 246 Ga. 612 (5) (272 SE2d 281) (1980).

Defendant's allegations do not justify mutiny and murder. See Hampton v. United States, 425 U. S. 484 (96 SC 1646, 48 LE2d 113) (1976). *Strong v. State,* supra, does not require that an evidentiary hearing be conducted where the motion does not set forth a claim for the relief sought. Accordingly, we find that it was unnecessary for the trial court to hold an evidentiary hearing because the defendant's allegations, even taken as true, would have been an insufficient basis on which to dismiss the indictment.

2. Defendant contends he was denied due process and the right of compulsory process by the trial court's refusal to grant his motion for transfer for certain inmates who would have testified on his behalf.

Seven of the eight inmate witnesses who testified for the prosecution were granted protective transfers from Georgia State Prison. The defendant sought to obtain similar transfers for four inmates (Jerry Brown, Linwood Walker, Freddie Linton and Billy Harrison) who allegedly had exculpatory evidence to give on behalf of defendant but said they would not testify out of fear for their safety while inmates at Georgia State Prison.

Prior to trial a hearing, excluding prison personnel, was held to question the four inmates about their refusal to testify. The actual substance of their expected trial testimony was not brought out at the hearing, and although three of the four inmates testified that they had special information about the case which, according to them, would benefit the defendant, they gave no adequate explanation of

why they had previously told investigators that they knew nothing about the events.[7] The other inmate, Billy Harrison, testified that he would testify about prison conditions if he were granted a transfer. All of these inmates testified that they feared physical injury if they testified for the defendant while inmates at Georgia State Prison although none could identify who would harm them.

Defendant cites no authority for his interpretation of the state's duty to provide compulsory process for obtaining witnesses (6th Amendment and the state equivalent, Code Ann. § 2-111), and we have found no support for his contention. On the contrary, in a case where a defense witness went into hiding, this court stated that the courts cannot guarantee the attendance of witnesses. *Smith v. State,* 118 Ga. 61 (1) (44 SE 817) (1903). In United States v. Alessio, 528 F2d 1079 (9th Cir. 1976), cert. den. 426 U. S. 948 (1976), the court held that even though the government granted immunity to one of its witnesses, the government could not be required to grant immunity to defense witnesses where it was not shown that the denial of immunity to defense witnesses deprived the defendant of a fair trial. See also United States v. Carman, 577 F2d 556 (9th Cir. 1978); United States v. Turkish, 623 F2d 769 (2d Cir. 1980).

Pretermitting the question whether such an expansion of compulsory process was required by the constitution, we find the defense failed to make the requisite showing to merit such an order. It is undisputed that defendant was able to secure testimony from twenty-two other inmates at Georgia State Prison without transfers and that the four inmates in question failed to show they would be in actual danger of physical injury if they testified for the defendant without a transfer. Three of the four inmates had been transferred to Georgia State Prison from other institutions from which they had escaped. One of the four witnesses would have presented only cumulative evidence concerning conditions at the prison and the other three had given prior inconsistent statements to prison investigators. Although all prison personnel had been excluded from the pretrial hearing, these inmates nonetheless failed to satisfy the trial court that they were in danger of physical injury or mistreatment if they testified for the defendant.

On these facts, the trial court's denial of the transfer request has not been shown to constitute error.

3. Defendant contends the trial court denied him due process by refusing to release inmate records for use in his trial.

---

[7] Defendant's assertion that at least one of these inmates (not identified) would have testified that the defendant was not involved in the stabbings or assault, is not supported by the record.

Based on Brady v. Maryland, 373 U. S. 83 (83 SC 1194, 10 LE2d 215) (1963), the defendant and the other indictees filed motions for discovery and inspection of state records and notices to produce in which they sought information contained in the prison records of 19 inmates who were listed as witnesses for the state. Specifically, the defendant sought records containing the diagnostic and evaluation summaries for the specified inmates, their parole board investigations, personal history statements, social investigations, employment and military history, post-release plan, disciplinary reports and letters recommending or opposing parole.[8]

While it is clear that Brady, supra, requires production of evidence favorable to the accused which is material either to guilt or punishment, including evidence impeaching the prosecution's witnesses, Williams v. Dutton, 400 F2d 797, 800 (5th Cir. 1968), cert. den. 393 U. S. 1105 (1969), it is equally clear that Brady does not open the door for pretrial discovery of everything the prosecution knows about its and the defendant's witnesses. *Whitaker v. State,* 246 Ga. 163 (2) (269 SE2d 436) (1980), (see also 7 ALR3d 8, 22).

The trial court in this case clearly satisfied the disclosure requirements of Brady. One judge made an in camera inspection of the records and provided defendant with any exculpatory evidence and later another judge reviewed the records to insure that all exculpatory materials had been released. Pursuant to the court's order, the state provided the defendant with his own statements, the criminal records of the state's witnesses, and various other evidence deemed to be exculpatory. This met the requirements of Brady, supra, and no error has been shown.

Defendant argues that the first judge who made the in camera inspection was reviewing the files looking for exculpatory material as to all six indictees and that the files should have been reviewed on behalf of this defendant individually. They were, by the second judge. Defendant also argues that the first judge did not look for impeaching evidence. The only support cited for the proposition that the first

---

[8] On their faces, none of these records would appear to contain exculpatory information. Disciplinary reports are not per se impeaching as prior convictions involving moral turpitude would be. On appeal, defendant also asserts that he was denied access to the files on his witnesses which the state used to impeach two defense witnesses by use of prior inconsistent statements. He complains that he was denied the opportunity to review the state's files on his witnesses so as to evaluate their credibility. However, defendant did not seek the state's files on his witnesses in the court below. Moreover, we know of no authority to the effect that Brady requires the state to disclose the impeaching materials the state has on defense witnesses.

judge did not look for impeaching evidence is a statement by defense counsel to the second judge that the first judge looked for witness statements naming others as having committed or participated in the crimes. Defendant was furnished the convictions of the state's inmate witnesses and there is no showing that the two judges did not examine the files for other evidence impeaching the state's witnesses. We find no error here.

4. Defendant contends that the trial court erred in overruling his motion to dismiss for destruction of evidence.

In numerous pretrial motions, defendant, along with the co-participants, moved for discovery, production, inspection, examination and analysis of numerous items, some specified and other described generally. Included among such items were weapons and clothing taken from the inmates or found at the conclusion of the riot. The state responded as to the clothes and weapons that its goal had been to end the riot and to get the inmates under control and back into their regular dorms and that at the time the motions for discovery, etc., were made, the defendant's clothes and the weapons could not be located. The defendant moved to dismiss the indictment based on destruction of evidence, citing United States v. Bryant, 439 F2d 642 (D. C. Cir. 1971).

In United States v. Bryant, supra, the court held that Brady v. Maryland, supra, Rule 16 (Fed. R. Crim. P.) and the Jencks Act (18 USCA § 3500) require that, even before a motion for discovery is made, the government's duty to disclose upon motion operates as a duty to *preserve* material which must be disclosed later. The court reasoned that "Only if evidence is carefully preserved during the early stages of investigation will disclosure be possible later." (439 F2d at 651). The facts in Bryant were that an undercover narcotics agent contacted a man named Johnson who came to the agent's motel room. Johnson discussed selling heroin. The next day Johnson brought his supplier, Bryant, to the agent's motel room where negotiations for the sale were conducted. Johnson arranged for delivery away from the motel but the payment was made back at the motel room. The agent testified at trial; he was the government's only witness as to what was said in the motel room. A tape recording of the conversations made from an adjoining room had been "lost" by the agent in charge of the taping. In fact, in response to the defendant's motions for discovery or to dismiss the indictment it was learned that the agent who made the tape never intended to preserve it. The court characterized the loss of the tape recording as "intentional non-preservation by investigative officials" (439 F2d at 647). The court viewed the tape recording as "absolutely crucial to the question of appellants' guilt or innocence" (439 F2d 648). However, the court did not order the indictment

dismissed. It remanded for further hearing as to the degree of negligence by the government agent and bad faith involved.

United States v. Bryant, supra, is not directly applicable here. The Jencks Act and Rule 16 upon which the court relied are not applicable to state prosecutions. The defendants in Bryant were targeted suspects when the tape recording equipment was set up and the recording was made. There was only one witness for the government as to what the defendants said and what they said constituted proof of the crime for which they were charged. In the case before us we do not have "intentional nonpreservation" by investigative officials.

Here the state was working under unusually exigent circumstances. They were dealing not only with some 240 sets of clothing and over 40 weapons but with rioting prisoners who had started fires and murdered 3 men. Their investigation began only after the inmates were stripped and their weapons were separated from them and they were returned to their dorms. The defendant does not claim bad faith or systematic destruction in the nonproduction of his clothes and the weapons. The trial judge ordered production, but the items could not be produced. He overruled the defendant's motion to dismiss the indictment concluding that the jury could decide the case and finding that nonproduction did not deprive the defendant of a fair trial. We find no error here.

5. Defendant contends he was deprived of his right to a fair and impartial trial by the trial court's denial of his motions for change of venue. Defendant and four inmates filed a motion for change of venue on grounds that an impartial jury could not be obtained in Tattnall County because of extensive prejudicial pretrial publicity and bias of local citizens and because there existed serious danger of violence to the defendants without removal of the case.

The original motion for change of venue was denied but defendant renewed the motion before trial. Additional testimony was heard[9] and the trial court again denied defendant's motion but stated that he would reconsider the ruling if the motion was renewed after voir dire. The motion was renewed after voir dire and the trial court

---

[9] In support of defendant's motions, a number of expert witnesses were called to testify concerning jury prejudice. An economist, Dr. Sid Davis, testified that Georgia State Prison has a significant economic impact on the county. Dr. Lawrence E. Noble gave an analysis of local pretrial publicity and concluded that the riot had received extensive inflammatory coverage in the local newspapers. Cathy Bennett, a jury selection expert, testified that citizens living near prisons believed inmates were prone to violence and that one-third of the prospective jurors would not be truthful

overruled it, finding that a fair and impartial jury was available for defendant in Tattnall County.

The relevant law on change of venue is found in the Georgia Constitution (Code Ann. § 2-4306) and Code Ann. § 27-1101. Under these provisions, it is clear that the grant or denial of motions for change of venue lies within the discretion of the trial court and its discretion will not be disturbed on appeal absent an abuse of that discretion. *Jarrell v. State,* 234 Ga. 410 (2) (216 SE2d 258) (1975); *Patterson v. State,* 239 Ga. 409 (5) (238 SE2d 2) (1977); *Anderson v. State,* 222 Ga. 561 (150 SE2d 638) (1966).

The test adopted by this court for determining whether the trial court abused its discretion in overruling a motion for change of venue based on alleged juror prejudice is whether the jurors summoned to try the case are found at voir dire to have formed fixed opinions as to guilt or innocence. *Jarrell v. State,* supra; *Patterson v. State,* supra, *Messer v. State,* 247 Ga. 316 (4) (1981). The fact that conflicting evidence is submitted in support of and in opposition to the motion is not sufficient to demonstrate an abuse of discretion. *Jarrell v. State,* supra; *Thacker v. State,* 226 Ga. 170, 175 (173 SE2d 186) (1970).

The record before us shows an extensive sequestered voir dire of prospective and selected jurors which took two and one-half days and over seven hundred pages of transcript. A total of seventy-nine prospective jurors were examined, about twenty were excused for cause and fifteen challenged for cause by defense counsel were left on the panel. See *Messer v. State,* supra. All jurors in the venire put upon the defendant stated that nothing they had seen, heard or read had caused them to form an opinion for or against the defendant and that they had no fixed opinion as to the defendant's guilt or innocence.[10]

None of the jurors ultimately selected to hear the case knew either the victims or the defendant.[11] None of these jurors had ever worked at Georgia State Prison and only five knew someone who worked there. Only four jurors had heard about the case itself.

We find that the prospective jurors passed the test of impartiality and the trial court did not abuse its discretion in overruling defendant's motion for a change of venue.

during voir dire. Dr. Jack Tucker, a sociologist, testified that a survey conducted in Tattnall County showed the citizens were prejudiced against prisoners generally and against black inmates particularly. Dr. John B. McConahay, a psychologist, testified that it would be difficult to find jurors in Tattnall County who did not have some link to the prison and that such jurors would be predisposed to favor the prosecution.

[10] The fact that one juror had sworn to his impartiality and later engaged in a counter demonstration (see Division 8) does not change this statement of fact as to the other jurors.

[11] Neither Foskey nor Harrison was a resident of Tattnall County.

6. Defendant contends the trial court erred in refusing to grant challenges for cause to jurors with contacts directly to Georgia State Prison or its employees. Specifically, defense counsel sought to challenge for cause 15 potential jurors who had close friends or relatives employed by Georgia State Prison.

Challenges are, generally speaking, of two types: (1) challenges to the "array"; i.e., challenges to the panels as a whole, and (2) challenges to the "poll"; i.e., challenges to individual jurors. *Hagans v. State,* 77 Ga. App. 513 (1) (48 SE2d 700) (1948); Daniel, Georgia Criminal Trial Practice § 18-5 (1977). There are two types of challenges to an individual juror for cause:[12] (1) for principal cause, and (2) for favor. *Hagans v. State,* supra. Challenges for principal cause are based on facts which, if proved, automatically disqualify the juror from serving. See Code Ann. § 59-804.[13] Challenges for favor are based on admissions of the juror or facts and circumstances raising a suspicion that the juror is actually biased for or against one of the parties. *Hagans v. State,* supra; Daniel, supra, § 18-7 (2).

We deal here with challenges to individual jurors for favor (which, as noted, are challenges for cause). Code Ann. § 59-705 is frequently cited as specifying challenges for favor, undoubtedly because of its title ("Challenge for favor"). That Code section, insofar as criminal cases are concerned, provides as follows: "In all criminal cases both the State and the defendant shall have the right to an individual examination of each juror from which the jury is to be selected prior to interposing a challenge. Such examination shall be conducted after the administration of a preliminary oath to the panel or, in criminal cases, after the usual voir dire questions have been put by the court, and in such examination the counsel for either party shall have the right to inquire of the individual jurors examined touching any matter or thing which would illustrate any interest of the juror in the cause, including any opinion as to which party ought to prevail, the relationship or acquaintance of the juror with the

---

[12] Peremptory challenges are also challenges to individual jurors, *Hagans v. State,* supra, but they are not challenges for cause.

[13] Code Ann. § 59-804 provides: "On calling each juror, he shall be presented to the accused in such a manner that he can distinctly see him, and then the State, or the accused, may make any of the following objections, viz.:

1. That he is not a citizen, resident in the county.
2. That he is under 21 years of age [see Code Ann. § 74-104.1].
3. That he is an idiot or lunatic, or intoxicated.
4. That he is so near of kin to the prosecutor, or the accused, or the deceased, as to disqualify him by law from serving on the jury." Matter in brackets added.

Regarding (4), disqualification by reason of relationship, see Code Ann. § 59-716.

parties or counsel therefor, any fact or circumstance indicating any inclination, leaning or bias which the juror might have respecting the subject-matter of the suit, or counsel or parties thereto, and religious, social and fraternal connections of the juror." This provision deals with the scope of voir dire but does not set forth the test for disqualification for favor. For example, members of a particular religious denomination would not be disqualified simply because the prosecutor, accused or deceased was a member of the same or a different denomination.

The reference in Code Ann. § 59-705, supra, to "the usual voir dire questions . . . put by the court" is to Code Ann. § 59-806 (insofar as felony trials are concerned) and this Code section establishes the test for disqualification for favor.[14] See Code Ann. § 59-807.[15]

Although a juror may have been acceptable under Code § 59-806 when questioned by the court, the juror may be shown to be partial when questioned by the state or defense and if such showing is made, the juror should be stricken for cause.

The defendant has identified prospective juror Billy H. Murphy as being the juror, out of the 15 challenged unsuccessfully, which the trial court most clearly should have stricken for favor. Mr. Murphy

---

[14] Code Ann. § 59-806 (as amended) provides: "On trials for felonies any juror may be put upon his voir dire and the following questions shall be propounded to him, viz.:

1. 'Have you, for any reason, formed and expressed any opinion in regard to the guilt or innocence of the accused?' If the juror shall answer in the negative, the following question shall be propounded to him:

2. 'Have you any prejudice or bias resting on your mind either for or against the prisoner at the bar?' If the juror shall answer in the negative, the following question shall be propounded:

3. 'Is your mind perfectly impartial between the State and the accused?' If the juror shall answer this question in the affirmative, he shall be adjudged and held a competent juror in all cases where the offense does not involve the life of the accused; but when it does involve the life of the accused, the following additional question shall be put to him:

4. 'Are you conscientiously opposed to capital punishment?' If he shall answer this question in the negative, he shall be held a competent juror: Provided, nevertheless, that either the State or the defendant shall have the right to introduce evidence before the judge to show that the answers, or any of them, are untrue; and it shall be the duty of the judge to determine upon the truth of such answers as may be thus questioned before the court."

[An affirmative answer to the 4th question leads to further examination of the juror. See *Cofield v. State,* 247 Ga. 98, fn. 4 (1981).]

[15] Code Ann. § 59-807 provides: "If a juror shall answer any of the questions set out in the preceding section so as to render him incompetent, or he shall be so found by the judge, he shall be set aside for cause."

had worked as a deputy in the Bibb County sheriff's office for about 17 years;[16] had known the district attorney when the DA had been a Macon city detective; was working at the time of the trial for the State Board of Pardons and Paroles as institutional parole supervisor at Georgia State Prison (the prison being operated by the Department of Offender Rehabilitation); knew the deceased guard, Dan Harrison, casually; had worked with him on the Friday before the riot; and expressed the view that it would be hard for him to base his decision strictly on what he heard in the courtroom because he had worked with the deceased guard. Mr. Murphy stated that he would do his best to keep an open mind during the trial but could not say positively whether he could do so or not. At the conclusion of his voir dire, Mr. Murphy stated affirmatively that at that time he had no fixed opinion as to the guilt or innocence of the defendant.

On this record we cannot find that the trial judge erred in overruling the challenges for favor. *Butler v. State,* 231 Ga. 276 (201 SE2d 448) (1973); *Taylor v. State,* 243 Ga. 222 (2) (3) (253 SE2d 191) (1979); *Tant v. State,* 123 Ga. App. 760 (3) (182 SE2d 502) (1971); see also *Hicks v. State,* 126 Ga. 80 (1) (54 SE 807) (1906).

Our strict rules as to juror disqualification for favor are offset by the large number of peremptory strikes allowed a defendant in most felony cases, 20 strikes for the defendant, 10 for the prosecution. Code Ann. § 59-805.[17]

Considering the number of peremptory strikes available to this defendant we note that, of the 15 jurors challenged for cause, only one, Mrs. Ward Shuman, sat on the defendant's jury. Mrs. Shuman's brother-in-law was employed by Georgia State Prison in "the industrial department or something." The brother-in-law did not work on Sundays and hence was not working the day of the riot and Mrs. Shuman had never discussed the riot with him.

We find no reversible error in this enumeration.

7. Defendant contends the trial court deprived him of trial by a representative cross-section of the community by permitting the state to exercise its 10 peremptory strikes to obtain an all white jury.

---

[16] Mr. Murphy was not employed as a law enforcement officer at the time of trial and he never had been employed as such officer in Tattnall County. *Hutcheson v. State,* 246 Ga. 13 (268 SE2d 643) (1980), is therefore inapplicable.

[17] According to the Center for Jury Studies (McLean, Va.), Connecticut leads the nation in allowing 25 peremptory strikes in capital cases. Georgia and 13 other states allow the defendant 20 peremptory strikes in capital cases. Georgia and Maryland also allow 20 strikes in noncapital felony cases. Center for Jury Studies Newsletter, No. 2-5, Sept. 1980.

The 48-member venire from which the jurors and alternates were obtained included six black jurors.[18] All six were peremptorily stricken by the state. The defendant contends that such use of peremptory strikes deprived him of a jury composed of a fair cross-section of the community and evidenced a discriminatory intent prohibited by the Equal Protection Clause. This contention was rejected in Swain v. Alabama, 380 U. S. 202, 221 (85 SC 824, 13 LE2d 759) (1965), where the Supreme Court held that the peremptory striking of all black prospective jurors in a case is not a denial of equal protection. That Court went on to say (380 U. S. 223-224): "But when the prosecutor in a county, in case after case, whatever the circumstances, whatever the crime and whoever the defendant or the victim may be, is responsible for the removal of Negroes who have been selected as qualified jurors by the jury commissioners and who have survived challenges for cause, with the result that no Negroes ever serve on petit juries, the Fourteenth Amendment claim takes on added significance. ... If the State has not seen fit to leave a single Negro on any jury in a criminal case, the presumption protecting the prosecutor may well be overcome. Such proof might support a reasonable inference that Negroes are excluded from juries for reasons wholly unrelated to the outcome of the particular case on trial and that the peremptory system is being used to deny the Negro the same right and opportunity to participate in the administration of justice enjoyed by the white population. These ends the peremptory challenge is not designed to facilitate or justify."

The defendant in the present case has failed to prove systematic exclusion of black jurors by use of peremptory challenges by the District Attorney of the Atlantic Judicial Circuit and we find no merit in this enumeration of error. Swain v. Alabama, supra; *Jordan v. State,* 235 Ga. 732 (1) (222 SE2d 23) (1975); *High v. State,* 247 Ga. 289 (1) (1981)[19]

The defendant argues on appeal that the requirement, that systematic exclusion of black jurors be shown by the prosecutor's use of peremptory strikes in cases other than the case on trial, imposes a burden on the defendant of anticipating before trial that the prosecutor will misuse the state's peremptory strikes at trial. We note that, although the defendant tendered additional proof of alleged

---

[18] The grand jury list was revised prior to trial and the defendant was reindicted. No challenge to the trial array (see division 6) has been enumerated on this appeal.

[19] It should be noted that of the 6 black jurors stricken, 4 had some opposition to capital punishment and another had 2 misdemeanor convictions and had been

governmental misconduct in the operation of the prison (see Division 1) at the hearing on the motion for new trial, no evidence bearing on the alleged misuse of peremptory strikes was tendered at that hearing. We find no error here.

8. Defendant contends the trial court erred in failing to voir dire qualified jurors concerning intervening pretrial publicity. Sequestered voir dire commenced on Wednesday afternoon and a venire of 50 remained on Friday afternoon after voir dire and strikes for cause. Although there was sufficient time for peremptory challenges and selection of the jury on Friday afternoon, the parties agreed to delay final selection of the jury to avoid having to sequester the selected jurors throughout the weekend.

The trial court charged the jury that "It is imperative that you keep the same state of mind that you under oath said that you had when you left this witness stand up here on your individual voir dire. That is that you are fair and impartial as between the State and the accused and that you would retain that impartiality throughout the proceeding. To enable you to do this the court instructs you that you are not to discuss this case with anyone, that means or includes your — any discussions with one another. It means that you're not to discuss it with any member of your family nor allow any member of your family to discuss it with you. You're not to discuss it with your minister or with any news media or anyone, not even with the Judge, not with the State, not with defense counsel, with no one. Just for all practical purposes your mind is closed on any discussion of this case from now until you have been discharged as a juror. . . [B]e very careful not to have the television broadcasting anything that has to do with this trial in any manner whatever, any phase of it. That you not listen to any of the broadcasts of any kind, that you not listen to the radio and that you not read any news accounts, whether it be a newspaper or whether they be in church bulletins or whether they be in any other, from any other source. You're simply not to have any information enter your mind about this case other than that information that comes to you from inside this courtroom. Close your mind to it."

Upon return from the weekend recess, defense counsel renewed his motion for change of venue and requested another individual voir dire based on substantial local publicity concerning a prison protest march led by civil rights leader Hosea Williams which had culminated in Reidsville over the weekend. This motion for individual voir dire was denied but the trial judge agreed to propound

---

arrested 3 times by the GBI prosecutor of the case. The reason offered by the state for striking the sixth juror is not found in the record.

questions concerning possible bias to the venire as a whole.

At the same time, defendant sought to challenge two members of the venire, Wendell Sikes and Mikki Monroe, concerning their activities over the weekend. Testimony was taken and juror Sikes was stricken for cause after he admitted demonstrating against the protest march. Juror Monroe remained on the venire after reasserting her impartiality and denying she made derisive remarks to protesters.

After the court disposed of these two individual juror challenges, defense counsel stated that they had nothing further, and the trial proceeded although the venire voir dire agreed to by the court had not been done. Defendant now seeks to reverse for its absence.

Jurors are presumed to follow instructions given them by the court. This presumption exists until a contrary showing is made (as it was as to juror Sikes). But see United States v. Perrotta, 553 F2d 247 (1st Cir. 1977). Even assuming that the failure to re-examine the venire as to publicity of the events of the weekend constituted error, see United States v. Herring, 568 F2d 1099 (5th Cir. 1978), trial counsel has an affirmative duty to assist the court in conducting the trial and, where the court offers to take certain action in response to a multi-ground motion, the failure of the court to take such action after disposing of the other grounds of the motion will be deemed to have been waived where counsel does not remind the court to do so. Defense counsel's timely exercise of the right tendered by the court would have brought this matter to the court's attention and avoided any possible error. The defendant cannot rely on error which could have been so easily prevented.

9. Defendant contends that he was denied due process by the trial court's refusal to allow him to be present during the jury view of the scene.

Defense counsel filed a pretrial motion for a jury view on the ground that the jury's understanding of the layout of the prison was vitally important to allow them to critically evaluate eyewitness testimony. The motion specified that "said jury view be conducted in the presence of the court, court reporter, counsel, and defendant." This pretrial motion was denied without prejudice when heard by the court, but after opening arguments the court indicated it was inclined to grant the view. The prosecution objected to defendant's presence at the prison for security reasons and the following colloquy occurred between the trial judge and defense counsel: "The Court: . . . (T)he Court's not going to allow the defendant to go. Now, if you want to have the view of the premises without that then we all know the view of the premises is not a part of the evidentiary proceedings. It's simply background information. The court does not feel that the

presence of the defendant is needful, necessary, but would be unduly disruptive and it is sufficient, the court would deny a view of the premises rather than allow him to go. We're not going to allow him to go."

"Mr. Ellis: Your Honor, defense will not waive the defendant's presence.

"The Court: All right. The Court's not going to allow him to go. Now, does the defense still want to make its motion to view the premises?

"Mr. Ellis: Your Honor, the only thing I can say is that we want to make a motion, but we're not going to waive his presence.

"The Court: Well, the Court's going to disallow it. I'll grant your motion, but the defendant cannot be present.

"Mr. Ellis: Thank you, your honor."[20]

The trial court charged the jury that the view was only allowed to afford them a better understanding of the evidence and that they were to arrive at their verdict from evidence produced at trial. The judge instructed the jurors not to ask *anyone* any questions, except the judge, and he would see if such question was proper. The judge stated that the warden would point out changes in the prison instituted since the riot.[21]

On appeal, defendant contends the jury view is a stage of the proceedings under Georgia law and that under *Chance v. State,* 156 Ga. 428 (199 SE 303) (1923), he must be afforded the opportunity to be present in the absence of waiver.

Pretermitting the questions of waiver, and forced or induced or harmless error, we find the trial court action proper.

A jury view of a crime scene in the absence of the accused is not a denial of due process under the Fourteenth Amendment. Snyder v. Massachusetts, 291 U. S. 97 (54 SC 330, 78 LE 674) (1934); cf. 30 ALR 1357 (1924).[22] Snyder was a due process case. Since Snyder, the

---

[20] If the defendant had been allowed to attend the jury view, we might be faced with the question of whether the jury could see the defendant in restraining devices and escorted by several security guards.

[21] The defendant argues on appeal that the warden was not warden at the time of the disturbance and that he, the defendant, needed to be present to verify or dispute the warden's statements as to changes, particularly as he, the defendant, had been moved from the prison.

[22] The annotator noted (30 ALR 1357): "The conflicting opinions seem to arise, in part at least, from different conceptions as to the nature and purpose of a view — whether it is for the purpose of obtaining information which may be regarded as evidence, or simply to enable a jury to apply and understand the evidence submitted in court."

United States Supreme Court has held that the 6th Amendment right of confrontation is applicable to the states. Pointer v. Texas, 380 U. S. 400 (85 SC 1065, 13 LE2d 923) (1965). However, the 6th Amendment right to confrontation is not violated by the defendant's absence from a view of a crime scene. Valdez v. United States, 244 U. S. 432, 445 (37 SC 725, 61 LE 1242) (1917), cited with approval in Snyder v. Massachusetts, supra, 291 U. S. at 121; see also Bustamante v. Eyman, 456 F2d 269, 272-273 (9th Cir. 1972); Commonwealth v. Curry, 368 Mass. 195 (330 NE2d 819, 821) (1975); VI Wigmore on Evidence, § 1803 (1976); McCormick on Evidence, 2d, § 216, p. 538, fn. 12 (1972).

The right of the accused to be present at a jury view is therefore a matter of state law. See Code Ann. § 2-111. The leading Georgia case is *Chance v. State,* supra. There this court found error in a jury viewing an automobile without the presence or waiver of the defendant at the view. Although the language of the opinion is emphatic, it is clear that the automobile was introduced as evidence in the case (156 Ga. at 430, 431). *Durrett v. State,* 135 Ga. App. 749 (219 SE2d 9) (1975), similarly involved a jury view of an automobile introduced as evidence in the case (135 Ga. App. at 751). In *Durrett,* an issue developed as to whether a police car had been struck by a bullet. *Crawford v. State,* 41 Ga. App. 486 (153 SE 380) (1930), similarly involved a jury view of an automobile allegedly struck by a bullet. The recent case of *Palmer v. State,* 155 Ga. App. 368 (271 SE2d 24) (1980), also involved a jury view of a vehicle.

There appear to be at least two types of jury view. One, an "evidentiary view," is to permit the jury to view evidence introduced in the case which evidence is so large or affixed that it cannot be brought into the courtroom. See the automobile cases cited above. Another, "the scene view," is to permit the jury to view the premises relevant to the case to enable the jury to better understand the testimony and other evidence introduced in court (e.g., a jury view of the scene of the alleged crime."[23] A view of the scene is not "evidence" in the case. *Shahan v. American Tel. Co.,* 72 Ga. App. 749, 754 (35 SE2d 5) (1945); see also *State Hwy. Dept. v. Andrus,* 212 Ga. 737, 739 (95 SE2d 781) (1956); *Brookhaven Supply Co. v. DeKalb County,* 134 Ga. App. 878, 880 (216 SE2d 694) (1975).[24]

---

[23] If the jury were to view damage caused by the crime (e.g., bullet holes in the walls and ceilings viewed), we would have a view combining both types.

[24] The proposition that a jury view of the scene is not evidence has been criticized in the context of appellate review of the evidence. IV Wigmore on Evidence, § 1168 (1972); McCormick on Evidence, 2d, § 216, p. 539 (1972).

We hold that a jury view of the premises relevant to the case made for the purpose of enabling the jury to better understand the testimony and not made for the purpose of allowing the jury to see evidence introduced in the case, which view is conducted without the presence of the defendant, does not violate the defendant's right of confrontation. See *Harwell v. England,* 234 Ga. 640 (217 SE2d 154) (1975). We further hold that it is within the trial judge's discretion to allow the defendant on trial in a criminal case to attend the view of the alleged crime scene, or to refuse to allow the defendant to do so for cause.

Applying this analysis, we find no abuse of discretion in the trial court's exclusion of defendant from the jury view of the prison. The jury view in this case was not evidence and the trial court committed no error in excluding the defendant.

Regarding the defendant's argument that the warden pointed out changes at the prison since the riot, we note that no objection was made to this procedure when it was announced. Although we have no transcript of the warden's statements (see Snyder v. Massachusetts, supra), the defendant's counsel was present during the view and the state's first witness was the warden's administrative assistant. The defense had available diagrams of the dormitories involved and could have cross examined this witness as to the correctness of any statements made by the warden during the view. As in Snyder v. Massachusetts, supra, 291 U. S. at 118, we find no reversible error here.

10. Defendant contends the trial court erred in refusing to allow the testimony of a witness who had violated the rule of sequestration. At trial, the defense called Howard Manchel, an attorney for a co-participant, to impeach the testimony of Tommy Stroud, the state's principal inmate witness. Specifically, the defense sought to prove that Stroud had previously told Manchel that a number of inmates, including the defendant and inmate Henry Holt, were involved. At trial, Stroud denied on cross examination that he had implicated Henry Holt. Although the argument of this motion was not transcribed, it appears that the state objected on grounds that Manchel had not been sequestered and his testimony was not impeaching. The court refused to allow Manchel to testify.

Code Ann. § 38-1703 states the rule of sequestration as follows: "In all cases either party shall have the right to have the witnesses of the other party examined out of the hearing of each other. The court shall take proper care to effect this object as far as practicable and convenient, but no mere irregularity shall exclude the witness."

The cases are conflicting as to whether a witness who violates the rule of sequestration is thereafter competent to testify. See *McElroy*

*v. State,* 154 Ga. App. 638 (269 SE2d 497) (1980), and cases cited in the three opinions in that case.

In *Shelton v. State,* 220 Ga. 610 (140 SE2d 839) (1965), the court, in answer to a certified question, held that where witnesses in a criminal case have been sequestered, and the defendant thereafter seeks to call as a witness a person who has remained in the courtroom, the testimony of such witness is admissible over objection by the state. In addition to numerous cases, the court cited the 6th Amendment (Code Ann. § 1-806), and its state counterpart, now Code Ann. § 2-111.

In *Wessner v. State,* 236 Ga. 162 (3) (223 SE2d 141) (1976), we held that it was discretionary with the trial court whether to permit a witness who had violated the rule to be recalled to the stand.

However, the history of the law regarding witness incompetency has been to make more and more witnesses competent to testify (see the 1979 amendment to Code § 38-1603, Ga. L. 1979, p. 1261), treating their former grounds of incompetence as matters of credibility to be considered by the jury. In the recent case of *Wright v. State,* 246 Ga. 53 (1) (268 SE2d 645) (1980), we said: "Violation of the sequestration rule did not affect admissibility of the testimony. The district attorney's recourse was to seek instructions from the court informing the jury that the presence of the witness in the courtroom in violation of the rule should be considered in determining the weight and credit to be given to the testimony of the witness."

In the interest of clarity and uniformity, in conformity with the trend toward witness competency, and in view of the constitutional rights of a defendant to call witnesses in his or her defense, we hold that a witness who has violated the rule of sequestration in a criminal case shall not be prevented from testifying. *Shelton v. State,* supra, and cases cited therein. See also *Wright v. State,* supra; *Cobb v. State,* 244 Ga. 344 (28) (260 SE2d 60) (1979); *Watts v. State,* 239 Ga. 725, 729-731 (238 SE2d 894) (1977). So much of *Wessner v. State,* supra, as finds to the contrary is overruled. It was error for the trial court to preclude Manchel from testifying as a witness for the defendant.

There remains the question of harm.

Stroud testified that the defendant and certain other inmates committed certain acts during the riot. Stroud's statement to investigators, which was admitted into evidence, contained some inconsistencies as to certain inmates and the defense sought to impeach Stroud based on these inconsistencies, as well as inconsistencies between Stroud's testimony and that of prison personnel called by the defendant.

Stroud was also cross examined about and impeached by introduction of his prior convictions (murder, burglary, motor

vehicle theft). In addition, three inmates testified that Stroud was "an habitual liar," that he was a "snitch" who could not be believed on oath, and that in addition to getting a better cell, he expected to get his time cut for testifying for the state (see fn. 2).

In closing argument the defense urged the jury not to believe Stroud, and the court fully charged the jury as to the credibility of witnesses and various means of impeachment.

We find that Stroud was amply impeached so that the jury could disbelieve him if it chose to do so. Apparently, the jury believed him, at least as to the murder and mutiny if not the aggravated assault on guard Foskey. In any event, we find the exclusion of Manchel's testimony to contradict Stroud by showing that Stroud has said Henry Holt was among the participants was harmless beyond a reasonable doubt.

11. Defendant contends the trial court erred in overruling his objection and motion for mistrial based on the prosecution's reference during closing argument to the conviction of Jessie Whitaker, the co-participant tried shortly before.

Co-participant Jessie Whitaker was tried and convicted on three counts of murder and one count each of simple battery and simple assault on May 12, 1980, approximately three months before defendant was tried.

At defendant's trial, defense cross examination established that Whitaker had actively participated in the riot and that he had stabbed both guards, sought to obtain officer Frankie Wells who had been granted asylum by inmates in A-3 dormitory, and had given orders and had acted, along with defendant, as inmate spokesman in negotiating an end to the riot.

Maintaining throughout the trial that the defendant was being tried because of his role as an inmate spokesman during settlement of the riot, the defense called correctional officer Jay Kries to the stand. He testified on direct examination that the defendant and Whitaker had opened the barricaded prison dormitory and brought the riot to conclusion. On cross examination of Kries, the prosecutor, without defense objection, established that Whitaker had been previously tried and convicted of murder resulting from the disturbance at the prison.

The prosecutor in closing argument stated, "If you believe the state's witnesses then this man was the leader of this group of people from the outset because he was the first man that grabbed Preston Foskey. There's more than one witness that has said that. And he was the last man, as the spokesman along with Jessie Whitaker who has been convicted of these same crimes, was the last man to speak for the group when they were barricaded in A-2, from the beginning to the

end." Defendant objected and made a motion for mistrial based on the reference to Whitaker's conviction. The objection was overruled. We find no error.

"The grant of a mistrial for improper argument of opposing counsel is very important, and should be liberally exercised in all cases where counsel abuse their right of argument by prejudicing the case of the opposite party. However, it is necessarily a matter largely within the discretion of the court; and unless it is apparent that a mistrial was essential to the preservation of the right of fair trial, the exercise of this discretion will not be interfered with." *Powell v. State,* 179 Ga. 401 (4) (176 SE 29) (1934). Accord, *James v. State,* 215 Ga. 213, 215 (109 SE2d 735) (1959); see also Code Ann. § 81-1009.

The prejudice, if any, to defendant's case occurred when the testimony as to Whitaker's conviction was given without objection, not when the prosecutor referred to that fact. As noted in *Thompson v. State,* 150 Ga. App. 567, 568 (258 SE2d 180) (1979), "It is the introduction of facts not in evidence that requires the application of remedies such as mistrial or rebuke." Accord, *Ruffin v. State,* 243 Ga. 95, 103 (252 SE2d 472) (1979); *Pressley v. State,* 207 Ga. 274 (4) (61 SE2d 113) (1950). Further, the record shows that in defendant's argument reference was made to Whitaker's trial. We find no error here. *Wynn v. State,* 207 Ga. 141 (3) (60 SE2d 767) (1950).

Defendant urges that Kries' testimony as to Whitaker's conviction was inadmissible in this case and that no waiver should be found where the objection and motion for mistrial were made before the case was submitted to the jury (i.e., were made during closing argument). We disagree for the reason that closing arguments are to be based upon the evidence in the case and reasonable deductions therefrom. *Gentry v. State,* 208 Ga. 370 (4) (66 SE2d 913) (1951). Thus, the evidence introduced during trial fixes the scope of the closing arguments, and counsel are entitled to rely on the admitted evidence in making the argument without fear of referring to evidence in the case which might be cause for a mistrial or rebuke. The defendant did not move to strike or exclude from the jury's consideration Kries' testimony as to Whitaker's conviction and thus *McCalman v. State,* 121 Ga. 491 (5) (49 SE 609) (1904), is inapplicable.

There being no reversible error, the judgment is affirmed.

*Judgment affirmed. All the Justices concur, except Hill, P. J., who dissents and Smith, J., who dissents to Division 5 and the judgment. Gregory, J., not participating.*

DECIDED MARCH 12, 1981.

*Forrest Andrew Jordan, Stroup, Goldstein, Jenkins & Pritzker, James K. Jenkins, John Oliver Ellis, Jr., Albert R. Sacks,* for appellant.

*Dupont K. Cheney, District Attorney, Arthur K. Bolton, Attorney General, Harrison Kohler, Assistant Attorney General,* for appellee.

HILL, Presiding Justice, dissenting.

In light of the facts set forth in Divisions 5, 6 and 8, I would find that at least the motion for change of venue made after the weekend demonstration and counter demonstration should have been granted. Compare *Whitaker v. State,* 246 Ga. 163 (269 SE2d 436) (1980). I therefore respectfully dissent.