Forrest Andrew JORDAN,
Petitioner-Appellant,

v.

Ray LIPPMAN, Warden, and Michael J.
Bowers, Attorney General for the State
of Georgia, Respondents-Appellees.

No. 84–8191.

United States Court of Appeals,
Eleventh Circuit.

June 21, 1985.

James K. Jenkins, Savannah, Ga., John
Oliver Ellis, Jr., Atlanta, Ga., for petitioner-
appellant.

Mary Beth Westmoreland, Asst. Atty.
Gen., Atlanta, Ga., Kenneth C. Etheridge,
Asst. U.S. Atty., Savannah, Ga., for respon-
dent-appellee.

Before VANCE and ANDERSON, Cir-
cuit Judges, and PITTMAN *, District
Judge.

R. LANIER ANDERSON, III, Circuit
Judge:

On July 23, 1978, there was a riot at the
Georgia State Prison in Reidsville ("GSP-
Reidsville"). The riot left two inmates and

---

* Honorable Virgil Pittman, U.S. District Judge for
the Southern District of Alabama, sitting by

designation.

one prison guard dead and another guard seriously wounded. Appellant Forrest Andrew Jordan was charged with mutiny in a penal institution, aggravated assault against the wounded guard, and the murder of the other guard. A Tattnall County, Georgia, jury convicted Jordan of mutiny and murder, sentencing him to five years on the mutiny charge and to life on the murder charge.[1] The sentences were to run consecutively to each other and to any other sentences then being served by Jordan. The jury acquitted Jordan on the aggravated assault charge. The Georgia Supreme Court affirmed Jordan's convictions and sentences. *Jordan v. State*, 247 Ga. 328, 276 S.E.2d 224 (1981).

Jordan then petitioned the United States District Court for the Southern District of Georgia for a writ of habeas corpus under 28 U.S.C.A. § 2254, alleging that his trial suffered from numerous constitutional infirmities.[2] In February 1984, the district court denied relief on all grounds and dismissed the petition. Because we find that the voir dire of prospective jurors at Jordan's trial was constitutionally inadequate in light of events which occurred on the weekend prior to Jordan's trial, we reverse the judgment of the district court and grant the writ conditioned on the state's right to retry Jordan within a reasonable time.

## I. THE JURY ISSUES

Jordan raises several issues with regard to the impartiality of the jury and jury panel at his trial. First, he alleges that extensive negative and racially-oriented pre-trial publicity coupled with inherent community prejudice based upon the socio-economic dependence of Tattnall County on GSP-Reidsville and racism in the community constitutionally required a change of venue. His motion for change of venue should have been granted, Jordan argues, without the necessity for any inquiry into particular juror prejudice because the inflamed situation in the community met the "presumed prejudice" standard as set out by the United States Supreme Court. *See, e.g., Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963).[3]

Second, Jordan argues that the trial court improperly failed to grant seventeen of his challenges for "cause" against jurors on the jury panel. As a result, one such juror was seated on the panel which convicted Jordan. These alleged errors also required the defense to use peremptory challenges which could have been used to strike other unwanted, but not legally objectionable, jurors.

Third, Jordan claims that his right to an impartial jury was potentially denied because the voir dire permitted by the trial court was inadequate to unearth possible juror prejudice. Under precedent binding in this circuit,[4] Jordan claims, he is entitled to relief if outside influences indicate a "significant possibility of prejudice" in the

---

**1.** The state sought the death penalty on the murder charge. The sentencing jury found four aggravating circumstances each of which could support a sentence of death, *see* Ga.Code Ann. §§ 17–10–30(b)(7)—(b)(10), but nonetheless exercised its absolute discretion in favor of life. *Id.* at § 17–10–31; *see also Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976).

**2.** Each issue raised by Jordan was presented to the Georgia Supreme Court on direct review, and the state concedes that Jordan has exhausted his state remedies as required by 28 U.S.C.A. § 2254(b). *See* Record at 108–09.

**3.** Appellant sets out the standard of review for "actual prejudice" in his brief as follows: If an accused can prove actual and identifiable prejudice attributable to pre-trial publicity or other outside influences to the jury as a whole or to

individual jurors, he is also entitled to relief. *See Irvin v. Dowd*, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). However, Jordan presents little specific legal argument or evidence of "actual prejudice," although he does argue that one individual who actually sat on the jury should have been struck for "cause." We need not reach, however, any argument implicitly resting on the "actual prejudice" rationale because of our disposition of the case.

**4.** In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

face of a voir dire procedure which was inadequate to permit discovery of juror bias. *See United States v. Davis,* 583 F.2d 190, 196–98 (5th Cir.1978). Jordan presses this last claim with respect to the entire voir dire process undertaken to identify which members of the venire should be struck for "cause," and also particularly with respect to the allegedly prejudicial events which occurred on the weekend prior to the trial, after the initial for "cause" strikes had been effected, but before peremptory strikes had been exercised by either party and prior to sequestration of the jury during the trial.

We conclude that Jordan is entitled to relief on this latter claim. An accused's constitutional rights to an impartial jury and due process under the Sixth and Fourteenth Amendments are violated unless an impartial jury can be impaneled. *See generally Irvin v. Dowd,* 366 U.S. 717, 720–22, 81 S.Ct. 1639, 1641–42, 6 L.Ed.2d 751 (1961). The trial court's failure to conduct a voir dire (or to allow defense counsel to make relevant inquiries to the panel members) after the events of the preceding weekend violated Jordan's constitutional rights, when viewed in the context of the prior publicity, the publicity concerning the weekend events, and the subject matter and all the circumstances of the case, all of which raised a significant possibility of juror prejudice. Thus, we do not reach the other jury issues raised by Jordan.

## A. *Background*

For purposes of this appeal, we need not detail the July 23, 1978 prison riot nor the facts of the particular incidents presented at Jordan's trial.[5] It is important to an understanding of Jordan's jury claims, however, to consider in some detail the situation at the prison prior to the riot, the general tenor and outcome of the riot, and the community response thereafter.

GSP-Reidsville has a long history of racial turbulence which we need only capsulize here. In April 1974, the United States

District Court for the Southern District of Georgia ordered the desegregation of the living and dining facilities at the prison. *Guthrie v. Caldwell,* Civ. No. 3068, slip op. at 1 (S.D.Ga. Apr. 10, 1974). In the months preceding the riot, incidents of racial violence were frequent. During a fourteen-hour period on March 15–16, 1978, "[r]acially oriented fighting took place in four living areas on the East side of the institution." The fight resulted in injuries to fourteen white inmates and five black inmates and the death of one black inmate. The Georgia Bureau of Investigation conducted an inquiry, but it resulted in no indictments. Respondent's Exhibit No. 3, vol. 2 (First Report of the Special Monitor on the Defendants' State of Compliance in *Guthrie v. Evans,* at 150). On May 11, 1978, one white inmate attacked two black inmates "inflicting superficial razor blade wounds." Internal disciplinary action was taken against the white inmate. *Id.* On June 24, 1978, a "[r]acially oriented fight took place in [the] gymnasium resulting in injuries to nine white inmates." No one was ever charged in this incident. *Id.* Finally, on July 1, 1978, "[a] group of white inmates attacked a group of black inmates while eating breakfast. This resulted in injuries to three black inmates and two white inmates and the death of one black inmate." The incident was investigated by the Georgia Bureau of Investigation, but no indictments were issued. *Id.*

On July 3, 1978, the federal court ordered the living quarters at GSP-Reidsville segregated by race. Respondent's Exhibit No. 2, vol. 5 at 892. At the time of the riot, GSP-Reidsville consisted of three dormitory buildings, buildings "A," "B," and "C." Each building had four dormitories of approximately 60 inmates each. *Id.* at 899. Dormitories A–2, A–3, A–4, B–1, B–2 and B–4 were all black, while dormitories A–1 and B–3 were all white. *Id.* at 901. Building "C" was not involved in the riot at all. On July 23, 1978, the day of the riot, the

---

5. The evidence as presented at trial is summarized in the Georgia Supreme Court opinion.

*See Jordan v. State,* 247 Ga. 328, 276 S.E.2d 224, 227–29 (1981).

prison remained racially segregated. *Id.* at 892.

While it is not necessary to detail the evidence presented at trial concerning the riot, it is important to note that the evidence took on, at least inferentially, a racial character. The riot was alleged to have begun in B-1, a black dorm, when Officer Preston Foskey, a white guard, was assaulted by an inmate. Foskey could not identify the inmate at trial, *id.* at 912-13, but the inmate was identified by some witnesses as Jordan. *Id.* at 921, 940, 980. Thereafter, Foskey was hit, stabbed, and knocked to the floor by a group of black inmates. *Id.* at 914, 915. In addition, Officer Dan Harrison, another white guard, was stabbed repeatedly by a group of inmates. *Id.* at 981. Two witnesses testified that Jordan participated in the attack on Harrison. *Id.* at 981, 1022. Foskey survived the attack; Harrison did not. Finally, the evidence indicates that in the aftermath of the riot two white inmates were found stabbed to death. *Id.* at 904; Respondent's Exhibit No. 2, vol. 6 at 1119-20.

Six inmates, all black, were indicted for alleged crimes arising out of the riot. The pre-trial press coverage of the incident was extensive. In support of Jordan's motion for a change of venue, defense counsel attempted to explain the amount and character of the pre-trial publicity. In considering the change of venue motion, the trial court admitted in evidence 50 articles concerning prison matters from the local weekly newspaper, the *Tattnall Journal*, running from February 2, 1978, through January 18, 1979 (just prior to the hearing on the change of venue motion). *See* Respondent's Exhibit No. 6, vol. 3 at 507 (transcript of change of venue hearing). Many of the newspaper articles concerning the riot itself stressed that the perpetrators of the crimes against the prison officials were black. Respondent's Exhibit No. 6, vol. 5 at 749 (Defendant's Exhibit No. 28). Law-

rence Noble, Jr., an expert on pre-trial publicity, testified on behalf of Jordan and the other co-indictees at the change of venue hearing of February 13-16, 1979. After explaining his analysis of the print media coverage of the prison riot and the subsequent indictments,[6] Noble reached several conclusions. First, he stated that there was "a saturation kind of coverage" on the front page and the opinion pages of the local newspaper. He testified that the material was inflammatory, concentrating on the bad character of the defendants. "[T]here was a lot of imputation of guilt by authorities, the most notable of which was the governor of Georgia." Respondent's Exhibit No. 6, vol. 3 at 513-14.[7] Noble also testified that the media portrayed a "we" versus "they" mentality:

> Then there was the clear theme in the entire publicity of, we against them. The guards against the outsiders in the form of Federal Judge, in the form of some of the Atlanta prison authorities and mainly we, against the inmates at the prison. And much of that was couched in terms of race. So that there was distintly [sic] the flavor of our people who are serving at great sacrifice to the State and who are very well qualified to do what they are doing, being put upon by outsiders in regard to this and previous incidents.

*Id.* at 514. Just prior to trial, Noble testified again at another change of venue hearing. He stated that he had analyzed the print media coverage since the trial of co-indictee Jesse Whitaker which occurred in May of 1979. Noble stated that in his opinion the type of media attention given the Whitaker trial "was very inflammatory and very prejudicial." Respondent's Exhibit No. 1, vol. 1 at 79. Many of the articles concerning the Whitaker trial indicated that there were others involved in the incidents, and at least one of the articles men-

---

6. Noble was unable to analyze the electronic media because of lack of funds. *See* Respondent's Exhibit No. 6, vol. 3 at 502-03.

7. One article purported to quote Governor Busbee to the effect that the perpetrators "will never injure anyone again." Respondent's Exhibit No. 6, vol. 3 at 750.

tioned Jordan by name. *See* Respondent's Exhibit No. 1, vol. 2 at 374–77.

Jordan also presented evidence concerning the economic and social impact of GSP-Reidsville on the Tattnall County community in his effort to show that a change of venue was required. Two economists testified. One testified that GSP-Reidsville was the largest single revenue-producing entity in the county, accounting for fourteen percent of the earned income of the county. Respondent's Exhibit No. 6, vol. 2 at 473–74. Another economist testified that the economic ripple effects of the prison were significant, and that therefore at least one-sixth of Tattnall County households had some economic dependence on GSP-Reidsville. *See generally,* Respondent's Exhibit No. 1, vol. 1 at 20–28.

Jordan further argues that the characteristics of the jury venire and the voir dire of prospective jurors supports his claim of massive pre-trial publicity and inherent prejudice in the community because of the importance to the community of GSP-Reidsville. The jurors were chosen from a group of 79 potential jurors. Eight of the 79 potential jurors were either currently employees of the prison or had been employees there. Forty-three of the 79 potential jurors had friends and/or relatives who worked at the prison. In addition, a vast majority of the potential jurors had heard of or read about the prison riot. *See generally* Respondent's Exhibit No. 2, vol. 1–4. This is consistent with an opinion survey presented at the change of venue hearing in February 1979, which found that 89% of all Tattnall County respondents had read about the riot in the newspaper. Respondent's Exhibit No. 6, vol. 3 at 660.[8] Twenty-one of the 79 prospective jurors were excused for cause on account of bias or potential bias. Jordan claims that an additional 17 jurors should have been excused for cause. *See generally* Respondent's Exhibit No. 2, vol. 1–4. Each of these 17 had

relatives and/or personal friends who worked at the prison. *Id.*

On Friday, August 10, 1979, the voir dire process, extending over 700 pages of transcript, had apparently been completed. Forty-two jurors were thus "qualified" to serve on the jury. The court then made the following comments to the jurors and gave the following instructions:

As all of you have been previously instructed this is a case ... in which ... if the defendant should be found guilty ... the jury ... could impose the death penalty. Under those circumstances this being the magnitude of the case, certain other protections of the law come into play.... This means simply that in the—a case of this type that the jury can no longer be sequestered once they have been sworn. That is the panel has been sworn that is to actually try the case. Now, we've been going through what is known as the voir dire examination, I'm sure that all of you are well aware of that at this point. We would now come to that stage of the proceeding where the State and the defense counsel would exercise what are known as peremptory challenges.... Once this is done that jury remains, as the court has said, sequestered. If we proceeded with that phase of the matter this afternoon then that would require that those fourteen jurors be locked up over the weekend in a motel, hotel and so forth. Both the State and the defense have joined in a request which is concurred in wholeheartedly by the Court that that phase of the case be deferred until Monday morning at 9:00.... So then we're going to defer the peremptory challenges then until Monday morning at 9:00. And that would mean then that you could be disbursed or go about your business this week-end under certain instructions from the Court, the Court will now give you.

8. In addition, 88% of the Tattnall County respondents stated that they had heard about the prison riot from friends and 47% had heard

about it at work. Respondent's Exhibit No. 6, vol. 3 at 660.

It is imperative that you keep the same state of mind that you under oath said that you had when you left this witness stand up here on your individual voir dire. That is that you are fair and impartial as between the State and the accused and that you retain that impartiality throughout the proceeding. To enable you to do this the Court instructs you that you are not to discuss this case with anyone, that means or includes your— any discussions with one another. It means that you're not to discuss it with any member of your family nor allow any member of your family to discuss it with you. You are not to discuss it with your minister or with any news media or anyone, not even with the Judge, not with the State, not with defense counsel, with no one. Just for all practical purposes your mind is closed on any discussion of this case from now until you have been discharged as a juror. Now, in addition to this, you all live in households and there are other folks there that enjoy television and newspapers and all of these things that we all do and they are going to want to participate in those and it's going to be—I'm going to ask you to ask them to help you keep your oath as jurors. To be very careful not to have the television broadcasting anything that has to do with this trial in any manner wahtever [sic], any phase of it. That you not listen to any of the broadcasts of any kind, that you not listen to the radio and that you not read any news accounts, whether it be a newspaper or whether they be in church bulletins or whether they be in any other, from any other source. You're simply not to have any information enter your mind about this case other than that information that comes to you from inside this courtroom. Close your mind to it. I know that you are going to comply with this and I, the Court, knows as do counsel for both sides or they would never have concurred with this request that they have concurred in and in fact passed on to the court, that you be allowed to disburse over the week-end. None of us believe for one moment that there is any question with regard to the integrity of any juror in this courtroom. And it's our desire that you in no way be embarrassed or that anything happen that would cause you or require that you have to make any explanations of any kind. So I believe you fully understand what the Court is asking you to do.

Respondent's Exhibit No. 2, vol. 4 at 801–04.

That weekend there was a civil rights march from Savannah to Reidsville. The purpose of the march was to protest the death penalty, prison conditions at GSP-Reidsville in general, and the indictment of the six black inmates charged in relation to the July 23 riot. The protestors called for the dismissal of the indictments. The protest march, led by prominent Georgia civil rights leader Hosea Williams and participated in by national civil rights leaders, Dick Gregory and Julian Bond, received considerable press attention in Tattnall County. *See* Respondent's Exhibit No. 2, vol. 7 at 1474–78 (reproductions of numerous newspaper articles concerning the march). The newspaper articles generally tied the march directly to the prison riot and the related trials. *See id.* at 1475 (first paragraph of news article: "The jury panel for the trial of Forrest Jordan on charges of murder and aggravated assault has been pared to 50 prospective jurors, as marchers protesting the trial, the death penalty and conditions at Georgia State Prison near the city"); *id.* at 1476 (quoting newspaper article: "A demonstration at the gates of the prison was to focus upon opposition to the death penalty and harsh prison conditions, and seek the dismissal of murder charges against the 'Reidsville Brothers,' six black inmates accused of killing a white guard and two white inmates during prison riots in 1978"); *id.* at 1477 (quoting news article: "The marchers are in Reidsville to protest what they say are harsh conditions at Georgia State Prison. They are also protesting the death penalty and the trials of six black GSP inmates accused of murder and aggra-

vated assault at the prison during riots last summer").

The marchers entered Reidsville city limits on Highway 280 on Friday afternoon. A newspaper article entitled "Demonstrators Near Prison," which was devoted approximately one-half to the protest march and one-half to the jury voir dire and upcoming trial in Jordan's case, described the situation as the demonstrators entered Reidsville:

> A four-foot high cross was set aflame Friday afternoon alongside Ga. Highway 280 several hundred yards inside the city limits. Three black men at the scene said the cross was placed there by a white man driving a green van.

Respondent's Exhibit No. 2, vol. 7 at 1475. The newspaper article was accompanied by a picture of the burning cross underneath which was written "BURNING CROSS GREETED PROTESTORS—Scene At Reidsville City Limits." *Id.* Local press coverage also highlighted the activities of J.B. Stoner, the self-proclaimed white racist, and his supporters who passed out Confederate flags and National States Rights party placards as the protestors marched into downtown Reidsville to the Tattnall County Courthouse. The Sunday morning *Savannah Morning News*, the primary daily paper in Tattnall County, reported as follows:

> Once in the downtown area, however, the marchers encountered a small group of white counter-protesters, led by white supremacist J.B. Stoner of Atlanta. Stoner passed out confederate flags and National States Rights party placards, carrying messages calling for "white power" and stating that "we cannot have law & order and Negroes too."
>
> "I don't like the way Hosea Williams is here trying to cause white prisoners trouble," Stoner said. "Niggers is what's causing all the trouble out there (at the prison). He's trying to stir niggers up against the white prisoners.

Also, he's trying to keep six nigger murderers from getting electrocuted."

> Stoner noted ... "the reason more niggers get the death penalty is they cause all the violent crime."

*Id.* at 1477.

On Monday morning, when Jordan's trial reconvened, defense counsel renewed the motion for change of venue. Respondent's Exhibit No. 2, vol. 4 at 814–18. The court then admitted in evidence the newspaper articles relating to the protest march. *See id.* at 821–22.

Defense counsel then requested additional and individualized voir dire to enable him to uncover any prejudice which may have resulted from the events of the prior weekend. The court denied counsel's request for renewed voir dire, but agreed to propound to the jury as a whole the general statutory questions as to impartiality.[9]

The court did permit, however, additional voir dire of two jurors, Wendell Sykes and Mikki Monroe, because defense counsel was prepared to proffer specific evidence that they had been involved in the weekend activities. *Id.* at 813–15. Sykes testified that he had heard and understood the court's instructions given on Friday afternoon. *Id.* at 832. He then testified that he accompanied a man named Fred Rogers in Rogers' pick-up truck to a road outside of Reidsville where Mr. Rogers burned the cross referred to above. Sykes testified that it was he who built the five-foot high cross out of one-by-fours. The court then, after reprimanding Sykes for violating the court's instructions and threatening him with contempt, excused Sykes for "cause." *Id.* at 835–36.

The first witness to testify with respect to juror Mikki Monroe was Sophia Hibbard, an employee of the National Jury Project in Atlanta. She testified that she was in Tattnall County helping with the jury selection procedures for the Jordan case and related cases. *Id.* at 837. She testified that she was near the Tattnall County Courthouse on Saturday afternoon when the protest

---

**9.** The trial court apparently forgot to propound these general questions, and defense counsel did not remind the court to do so. *See infra* Part I.B.

march was there. She testified that she saw Mikki Monroe seated on a police car in the parking lot of the courthouse. She further testified:

> Well, they [meaning Ms. Monroe and two other individuals] were seated on the police car observing the—all of the defendants which were on the bus, the prison bus, being taken into the courthouse or whatever they were doing with them at that point. She [Monroe] was seated with two white men. And as different cars and pick-up trucks would drive by they would be yelling back and forth to each other, you know, the niggers and what they were doing and all that stuff.... I heard her laugh and say nigger.

*Id.* at 838. The court then asked Hibbard if she was positive that the person she observed was Monroe. Hibbard testified that "I know it was Mikki Monroe. I couldn't really tell, you know, I couldn't understand all the conversation that was happening because it was pretty confusing and people were milling around and you know." *Id.* at 839. Monroe was then brought into the courtroom and Hibbard made an in-person identification of Monroe as the person she saw and heard in front of the courthouse. *Id.* Defense counsel then questioned Monroe. She admitted to coming to Reidsville and the courthouse on Saturday afternoon, August 11. *Id.* at 840. She stated that she observed certain protestors being arrested. *Id.* She denied being seated on a police car. At first she stated she was standing and then she admitted to be leaning against the police car. *Id.* at 841. She said she did not speak to any police officers. She stated that she did not make any derisive remarks or comments in regard to the marchers or demonstrators that had been arrested. She said that she made no reference to "niggers." *Id.* She said she was with one of her girlfriends and stayed in Reidsville for about thirty minutes. She said she did not have any specific purpose coming to town other than that she was passing through town on her way to Vidalia. *Id.* at 842. The prosecutor cross-examined Monroe.

On cross-examination she stated that she could remain impartial. *Id.* at 843. Defense counsel then moved that Monroe be excused for "cause." He stated:

> I think that her actions were in violation of the Court's instructions [Friday] afternoon and I think that although she can answer the statutory question as to impartiality I think again actions have to speak louder than words. And her interest in the situation is such that she should be excused for cause and I think that this situation out here, although this defense counsel wishes it were not, this march situation is inextricably intertwines [sic] with this case ...

*Id.* at 844. The court then overruled defense counsel's request that Monroe be struck for "cause." *See id.* at 844-45. The court relied on the fact that the juror stated under oath that she would be fair and impartial and would remain fair and impartial. The judge stated that he "has absolutely no reason to believe that she won't [remain impartial]." *Id.* at 844.

## B. *Discussion*

As indicated above, Jordan challenges the adequacy of voir dire in light of the events of the weekend preceding his trial. Before addressing the merits of Jordan's contention, we must address the state's claim that Jordan waived any right to voir dire he may have had when the trial court reconvened on the Monday after the weekend demonstration. At the Monday morning hearing, defense counsel requested additional voir dire. Counsel made an oral motion that "the Court inquire individually of the jurors as to whether or not they heard, read, saw, had any participation in the events of this week-end." *Id.* at 823. The court responded:

> No, sir. The Court's not going to do that.... No, just let me get this squared away, Mr. Jenkins. The Court will propound to the panel of jurors, the primary panel and to the second panel whether there is anything that, have any of them been—are they still fair and impartial and the questions will be

couched in the language of the statutory questions. This is the extent to which the Court is going in that regard absent of showing on the part of either side that there is some specific juror or jurors that have been tainted. This is what we're going to do and I'm going to address that to all 49 jurors at one time. I'm not going to sit down and ask each individual juror again. And I would remind defense counsel that defense counsel at your request, the Court excused this jury over the week-end and I'm not going to go through all that again. All right, now, state whatever you have in the record.

*Id.* at 823. Defense counsel responded:

If I could just amplify the question, I certainly do understand the Court's ruling. We would make a request on the basis that we have a banner headline involved in a locally distributed newspaper and Savannah Morning News which is introduced as an exhibit before this court.... We would also ask that the Court make inquiry as to radio and t.v. coverage and specifically as to C.B. radio transmissions that the jurors may have been exposed to. We again would request that the Court ask whether or not the juror saw, read or heard about the march and ask the Court to make those specific inquiries. And we would also, although we understand the Court's ruling, ask that the Court do so individually so that the jurors can respond more freely.

*Id.* at 824. The court again denied defense counsel's motion for such additional individual voir dire:

The Court has nothing to add to the ruling it's already made.

*Id.*

Thereafter, the court proceeded to take the evidence concerning jurors Sykes and Monroe. The trial judge apparently forgot to propound the standard statutory questions after the proceedings concerning jurors Sykes and Monroe, as he had indicated that he would. Moreover, after the evidence concerning jurors Sykes and Monroe,

when defense counsel was asked if he had anything else to present, he did not remind the court to propound the general statutory questions. On this basis, the Georgia Supreme Court found that Jordan had waived his claim to voir dire after the weekend events. *See Jordan v. State,* 247 Ga. 328, 276 S.E.2d 224, 237 (1981). *But cf. id.* at 242 (dissenting opinion of Hill, Presiding Justice) ("In light of the facts set forth ..., I would find that at least the motion for change of venue made after the weekend demonstration and counterdemonstration should have been granted"). The district court below concurred in the Georgia Supreme Court's finding of waiver. *See Jordan v. Lippman,* CV 482–133, slip op. at 28 (S.D.Ga. Feb. 7, 1984).

Since we decide the case on other grounds, we assume without deciding that Jordan waived any right to have the statutory questions asked. Such a finding of waiver, however, is not relevant to Jordan's right, if any, in the aftermath of the weekend events, to additional voir dire more specific than the general statutory questions. If Jordan had a right to such additional voir dire, he clearly did not waive it. As indicated by the above-quoted colloquy between the trial judge and defense counsel, Jordan's claim to additional individualized voir dire was forcefully pursued by defense counsel and unequivocally denied by the trial court. After the trial judge had denied the defense's request for additional voir dire, defense counsel "amplif[ied] the question," recognized the court's adverse ruling, but specifically requested "that the Court ask whether or not the jury saw, read or heard about the march" and requested that the court "do so individually so that the jurors can respond more freely." Respondent's Exhibit No. 2, vol. 4 at 824. Despite his understanding of the trial court's ruling, defense counsel laid out his request in an obvious attempt to preserve the issue on appeal. It cannot be fairly argued, therefore, that Jordan waived the right to additional more specific voir dire and individualized voir dire. Although the Georgia Supreme Court ad-

dressed explicitly only Jordan's waiver of the general statutory questions which the trial court had agreed to propound, *Jordan v. State,* 276 S.E.2d at 237, to the extent that the Georgia Supreme Court's finding of waiver applies to Jordan's request for more specific and individualized voir dire, we are not bound by such a finding because it has no support at all in the record. *See* 28 U.S.C.A. § 2254(d)(8) ("Presumption of correctness" given to state court fact-findings by a federal habeas court does not apply where upon consideration of the record as a whole the federal court "concludes that such factual determination is not fairly supported by the record"). In light of the foregoing, we proceed to analyze whether Jordan indeed had a constitutional right to such additional voir dire in the aftermath of the weekend events.

In *United States v. Davis,* 583 F.2d 190 (5th Cir.1978), the court recognized the need for adequate voir dire where a significant possibility of prejudice exists as a result of pre-trial publicity. *Davis* concerned a prosecution for certain alleged crimes arising out of a raid planned by the defendant to free his son and other American prisoners from a Mexican jail.

> Th[e] case attracted some national coverage and extensive local coverage by news media. Hill's [a codefendant's] motion brought to the court's attention the scope and substance of much of the local news coverage. Each juror had been exposed to some of this publicity. Prejudice was possible because of the backgrounds of Hill and his confederates [footnote omitted] and the sensational nature of some of the reports. These reports capitalized on the violence of the armed raid, its purpose to free drug users, and its international repercussions.

*Id.* at 196. The trial court in *Davis* admonished the jury panel to make its determination strictly from the evidence presented in court. The lower court determined that

every panel member had "heard about this case," *id.* at 196, and, therefore, it asked any panel member to raise his hand if he felt the publicity impaired his ability to render an impartial decision. No juror raised his hand. The court denied defendant Hill's request for individualized voir dire. *Id.* at 196.[10]

The court of appeals held that "[t]he district court erred in not undertaking a more thorough examination of those panel members exposed to publicity." *Id.* The court continued:

> Under the circumstances of this case, where the nature of the publicity as a whole raised a significant possibility of prejudice, the cursory questioning by the court was not enough. The court should have determined what in particular each juror had heard or read and how it affected his attitude toward the trial, and should have determined for itself whether any juror's impartiality had been destroyed.

*Id.* The *Davis* court recognized that where pre-trial publicity is a factor, a juror's conclusory statement of impartiality is insufficient. "[W]hen a juror is exposed to potentially prejudicial pretrial publicity, it is necessary to determine whether the juror can lay aside any impression or opinion due to the exposure. The juror is poorly placed to make a determination as to his own impartiality. Instead, the trial court should make this determination." *Id.* at 197. Thus, the *Davis* court rejected the district court's method for rooting out partiality—a simple and conclusory question presented to the jury panel as a whole—under the circumstances of the case. *Id.* at 198. The *Davis* court stressed that it was not erecting an inflexible rule. It held, nevertheless, that where there was extensive pretrial publicity and potential jurors had been exposed to such publicity, a more individualized inquiry into prejudice had to be undertaken. *Id.* at 197–98 (citing and explain-

---

10. Defendant Hill, as did Jordan in this case, had previously placed much of the publicity in the record and had filed a motion requesting an individual examination of every panel member exposed to publicity to determine the extent, frequency, and harmfulness of the exposure. *See United States v. Davis,* 583 F.2d 190, 196 (5th Cir.1978).

ing the procedure described in *United States v. Hyde,* 448 F.2d 815 (5th Cir.1971), *cert. denied,* 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972)).

The continued vitality of the principle elucidated in the *Davis* case—significant possibility of prejudice plus inadequate voir dire—has been evidenced by binding precedent in this circuit. *See United States v. Tegzes,* 715 F.2d 505, 507 (11th Cir.1983); *United States v. Holman,* 680 F.2d 1340, 1347–48 (11th Cir.1982); *United States v. Hawkins,* 658 F.2d 279, 282–85 (5th Cir. Unit A Sept. 21, 1981); *United States v. Gerald,* 624 F.2d 1291, 1295–98 (5th Cir. 1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981); *see also United States v. Chagra,* 669 F.2d 241, 250–54 (5th Cir.) (applying binding old Fifth Circuit precedent), *cert. denied,* 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982); *United States v. Colacurcio,* 659 F.2d 684, 689 (5th Cir. Unit A Oct. 22, 1981) (same), *cert. denied,* 455 U.S. 1002, 102 S.Ct. 1635, 71 L.Ed.2d 869 (1982); *cf. Pamplin v. Mason,* 364 F.2d 1 (5th Cir.1966). Although the above-cited cases differ in their outcomes depending on the facts and circumstances of each case, all of them recognize the principle that relief is required where there is a significant possibility of prejudice plus inadequate voir dire to unearth such potential prejudice in the jury pool. *See, e.g., Chagra,* 669 F.2d at 253 (In light of adverse pre-trial publicity, the district court individually questioned each panel member who had indicated knowledge of the case or related events from any source and, therefore, the strictures of *Davis* had been met); *Hawkins,* 658 F.2d at 285 ("in light of the nature and extent of the pre-trial publicity surrounding th[e] case and the fact that forty-eight of the fifty-six potential jurors acknowledged some exposure to the publicity, ... the district court's inquiry was, under *Davis,* insufficient to reveal possible juror prejudice ..."); *Holman,* 680 F.2d at 1348 (Since "[n]o significant possibility of prejudice was raised by the publication of

an article printed nearly two months prior to trial describing [defendant's] involvement in an entirely unrelated incident or by simple factual accounts of the ongoing investigation and prosecution ...," the voir dire procedure set out in *Davis* was not required).

The standard announced in *Davis* follows from the principles laid down by the United States Supreme Court. In *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), a federal habeas petitioner argued that his motion for change of venue should have been granted because massive pre-trial publicity had infected the jurors who had convicted him, despite those jurors' conclusory protestations of impartiality. The court examined the voluminous voir dire transcripts in the case and found that almost 90% of the jurors questions had entertained some opinion as to the defendant's guilt, including a majority of those on the jury which convicted Irvin. *Id.* at 727–28, 81 S.Ct. at 1645–46; *see id.* at 728, 81 S.Ct. at 1645 (8 of the 12 jurors, despite their claim that they could be impartial, "posses[ed] a belief in his guilt"). The court held, under a standard of "manifest error," *id.* at 723, 81 S.Ct. at 1642, that the state trial court had erred, and found instead that Irvin had been convicted by a prejudiced jury. Although the Supreme Court in *Irvin* granted relief on the basis of "actual prejudice," it is clear that the Court presupposed the right to a searching and extensive voir dire where the potential of prejudice exists as a result of pre-trial publicity. The Court relied primarily on the voir dire examination in concluding that a nexus between the adverse publicity and juror partiality had been established. *See also Rideau v. Louisiana,* 373 U.S. 723, 727, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663 (Clark, J., with whom Harlan, J., joined, dissenting) (must establish nexus between pre-trial publicity and petitioner's trial; without review of voir dire examination, as in *Irvin,* such nexus was not shown); [11] *Beck v. Washington,* 369 U.S. 541, 555–

---

11. The majority in *Rideau* held that where the defendant had confessed in a detailed "interview" with authorities which was videotaped and later played three times to large local television audiences, defendant's change of venue motion should have been granted. The *Rideau*

558, 82 S.Ct. 955, 963–964, 8 L.Ed.2d 98 (1962) (Court's review of record indicated that extensive voir dire had rooted out adverse effects of pre-trial publicity concerning well known labor leader charged with embezzling union funds; jurors' qualifications as to impartiality "far exceeded" the standards set out in *Irvin* ).[12]

The recent case of *Patton v. Yount,* 467 U.S. ——, 104 S.Ct. 2885, 81 L.Ed.2d 847

court held that the TV interview "in a very real sense *was* Rideau's trial...." *Id.* 373 U.S. at 726, 83 S.Ct. at 1419 (emphasis in original). "Any subsequent court proceeding in a community so pervasively exposed to such a spectacle could be but a hollow formality." *Id.* In such an instance, the Court held, prejudice could be presumed:

> [W]e do not hesitate to hold, without pausing to examine a particularized transcript of the voir dire examination of the members of the jury, that due process of law in this case required a trial before a jury drawn from a community of people who had not seen and heard Rideau's televised "interview."

*Id.* at 727, 83 S.Ct. at 1419.

The negative implication of *Rideau* is that voir dire ordinarily will be the tool by which juror prejudice is rooted out. In this regard, it is interesting to note that *Rideau* is one of only a few cases in which the Supreme Court presumed prejudice without an inquiry into the actual prejudice of jurors as evidenced by the voir dire examination. *See also Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (case involved television intrusion in actual trial, as well as massive pre-trial publicity); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (same). Otherwise, where the situation is not as outlandish as the "circus atmosphere," *Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975), which had been created in *Rideau, Sheppard,* and *Estes,* "[i]t is fair to assume that the method [of voir dire] we have relied on since the beginning ..., usually identifies bias." *Patton v. Yount,* 467 U.S. ——, ——, 104 S.Ct. 2885, 2892, 81 L.Ed.2d 847, 858 (1984) (describing why a state trial judge's determination of an individual juror's impartiality is entitled to a "presumption of correctness" on habeas review under 28 U.S.C.A. § 2254(d)).

**12.** In a related context, the Supreme Court has held that general statutory questions are insufficient to unearth juror bias. *Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973). In *Ham,* a black civil rights worker was prosecuted for possession of marijuana. Ham's defense at trial was that law enforcement officers had "framed" him because of his civil

(1984), makes even more clear the fundamental importance of voir dire as a tool for insuring the right to an impartial jury. In *Yount,* the defendant had been convicted of murder in the face of massive and inflammatory pre-trial publicity. Later, his conviction was reversed, and he was retried several years later after the initial publicity had died down. The case before the Supreme Court involved the effect of the initial publicity and renewed publicity on

rights activities. *Id.* at 525, 93 S.Ct. at 849. The Court held unanimously that the Due Process Clause of the Fourteenth Amendment required that the trial judge interrogate, or permit counsel for the defendant to interrogate, the jurors on the issue of potential racial bias. *Id.* at 527, 93 S.Ct. at 850. The Court found that the general statutory questions, similar to the ones propounded in *Irvin* and the ones which the trial judge agreed to propound in the instant case, *see infra* at 1280, were inadequate to unearth potential racial prejudice. *See Ham,* 409 U.S. at 526–27 & n. 3, 93 S.Ct. at 850–51 & n. 3. The petitioner in *Ham* also argued that he was entitled to ask specific voir dire questions concerning pre-trial publicity because the statutory questions were inadequate. The Court did not reach this issue because the petitioner had not included the allegedly prejudicial pre-trial publicity in the record on appeal. *Id.* at 528, 93 S.Ct. at 851. It is interesting to note that, although the instant case involves an alleged inadequacy of voir dire as to pre-trial publicity, not as to direct racial animus towards the defendant, the pre-trial publicity in this case, as we have indicated, had definite racial overtones. Thus, although we do not find *Ham* controlling by any means, Jordan's claim of right to additional voir dire in light of the weekend protest draws some support from the holding in *Ham* that the Constitution requires, under certain circumstances, voir dire tailored to unearth potential bias presented by the facts of a given case. *See also Rosales-Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981) ("Voir dire plays a critical function in assuring the criminal defendant that his Sixth Amendment right to an impartial jury will be honored. Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled"; but because criminal defendant did not argue, nor did facts indicate, that matters at issue in trial involved racial or ethnic prejudice as in *Ham,* voir dire as to racial or ethnic prejudice was not constitutionally required); *United States v. Magana-Arevalo,* 639 F.2d 226, 229 (5th Cir. Unit A 1981); *United States v. Eastwood,* 489 F.2d 818, 820 (5th Cir. 1973).

Yount's second trial. The *Yount* court rejected petitioner's claim that actual prejudice could be inferred from an examination of pre-trial publicity and the answers at voir dire of potential jurors who were not selected as the actual jurors on the panel which convicted him. Applying the standard set out in *Irvin*, the Court held that "the trial court did not commit manifest error in finding that the jury as a whole was impartial." *Id.* at ——, 104 S.Ct. at 2889, 81 L.Ed.2d at 854. The Court reviewed the amount, character and timing of the pre-trial publicity, finding that it was not as potentially prejudicial as that which had occurred in *Irvin*. *Id.* at ——–——, 104 S.Ct. at 2889, 81 L.Ed.2d at 854–55. Moreover, the Supreme Court relied heavily on the voir dire. *Id.* at ——, 104 S.Ct. at 2889, 81 L.Ed.2d at 855. ("The voir dire testimony revealed that this lapse of time had a profound effect ... on the jury, in softening or effacing opinion"); *id.* at ——–——, 104 S.Ct. at 2889–90, 81 L.Ed.2d at 855–56 ("The [voir dire] record suggests that their passions had not been inflamed nor their thoughts biased by the publicity"). The *Yount* court noted that of the venirepersons who had retained their fixed opinions, the trial court properly excused them. Thus, "the voir dire resulted in selecting [only] those who had forgotten or would need to be persuaded again [of their prejudice]." *Id.* at ——, 104 S.Ct. at 2890, 81 L.Ed.2d at 856. That being the case, the Supreme Court validated the conclusion of

Judge Garth, rendered in the court of appeals below, that " '[a] thorough and skillfully conducted voir dire should be adequate to identify juror bias, even in a community saturated with publicity adverse to the defendant.' " [13] *Id.* at ——, 104 S.Ct. at 2888, 81 L.Ed.2d at 853 (*quoting Yount v. Patton*, 710 F.2d 956, 979 (3d Cir.1983) (Garth, J., concurring in the judgment)).[14] *But cf. supra* note 11.

The courts of appeal have also recognized that voir dire is the key element in the trial court's constitutionally-mandated search for juror impartiality. The former Fifth Circuit in *Calley v. Callaway*, 519 F.2d 184 (5th Cir.1975) (en banc), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976), found, after an independent review of the voir dire, that the court marshal "court members" who convicted Lt. William Calley of killing scores of civilians at My Lai had been fair and impartial despite massive pre-trial publicity. The court relied heavily on the fact that there had been extensive and detailed voir dire. The court noted:

> There has been a greater willingness to uphold a trial court's determination that jurors were capable of rendering an impartial verdict where that conclusion was reached after deliberate, searching, and thorough voir dire.

*Id.* at 209 n. 45; *see also Yount v. Patton*, 710 F.2d at 979 (Garth, J., concurring in the

---

13. This is in keeping with the *Irvin* court's declaration that pre-trial publicity, without more, will not usually suffice to support a claim of jury partiality. *See Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 ("In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.... To hold that the mere existence of any preconceived notion as to guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard").

14. The Third Circuit in *Yount v. Patton*, 710 F.2d 956 (3d Cir.1983), granted habeas petition-

er's writ on two grounds: (1) that the jury panel as a whole had been rendered partial by pre-trial publicity under the standard set out in *Irvin v. Dowd*, and (2) one juror and two alternate jurors were improperly impaneled despite the defendant's motions to strike those jurors for "cause." The Supreme Court reversed the Third Circuit on both issues. *See Patton v. Yount*, 467 U.S. ——, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984). However, Judge Garth in his concurring opinion in the Third Circuit, concurred only in the result, agreeing with the Third Circuit majority that one juror should have been struck for "cause." Judge Garth opined, however, after a detailed review of the pre-trial publicity and the voir dire transcripts, that the pre-trial publicity had not infected the jury panel as a whole. Thus, the Supreme Court's reversal is in accord with this aspect of Judge Garth's opinion.

judgment) (citing numerous circuit court cases); *United States v. Duncan,* 598 F.2d 839, 865 (4th Cir.) (expressing "confidence in the effectiveness of a skillful voir dire to counteract the threat of pre-trial publicity"), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979); *Wansley v. Slayton,* 487 F.2d 90, 92–98 (4th Cir.1973) (independent federal habeas review of extensive, searching voir dire at state trial indicated that voir dire was adequate to root out any potential prejudice from pretrial publicity), *cert. denied,* 416 U.S. 994, 94 S.Ct. 2408, 40 L.Ed.2d 773 (1974); *United States v. Dellinger,* 472 F.2d 340, 366–77 (7th Cir.1972) (at page 366: "One of the paths to the impartial jury guaranteed by the sixth amendment is the voir dire examination"), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973); *cf. In re Application of National Broadcasting Co.,* 653 F.2d 609, 617 (D.C.Cir.1981) (responding to contention that potential juror bias in future prosecutions should bar release of so-called "Abscam" videotapes: "to the extent that some members of the potential jury pool are so affected by the broadcasting of tapes that they are unqualified to sit …, voir dire has long been recognized as an effective method of rooting out such bias, *especially when conducted in a careful and thoroughgoing manner*") (emphasis added).

The foregoing discussion makes clear that the *Davis* case is a necessary and natural outgrowth of the principles espoused in *Irvin v. Dowd* and subsequent cases. Although pretrial publicity is not in itself enough to require a change of venue, except in very rare circumstances, *see Rideau,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663, voir dire must be adequate to unearth potential prejudice. Indeed, the *Davis* court reasoned directly from *Irvin* in holding that "when a juror is exposed to potentially prejudicial pretrial publicity, it is necessary to determine whether the juror can lay aside any impression or opinion due to the exposure." *Davis,* 583 F.2d at 197 (citing *Irvin* ). *Davis* merely established a procedure by which the constitutional standards laid out in *Irvin* could be satisfied. *Id.* Other circuit courts have recognized that the standard enunciated in *Davis* —significant possibility of prejudice plus inadequate voir dire—follows from the precepts of *Irvin* and, thus, can form the basis of a constitutional argument of juror partiality under the Due Process Clause and the Sixth Amendment right to an impartial jury.[15] *See, e.g., Yount v. Patton,* 710 F.2d at 977 (Garth, J., concurring in the judgment) (quoting *Davis* as the prevailing standard and citing other circuit court cases); *United States v. Dellinger,* 472 F.2d at 374 ("it must follow [from *Irvin* ] that where pre-trial publicity is of a charac-

---

**15.** At oral argument, there was some discussion as to whether the principles established by *Davis* and its progeny applied in the habeas corpus context. It is true that the binding cases cited in the text are direct appeals of federal criminal convictions; however, as the discussion in the text makes clear, *Davis* both relied upon and is in accord with constitutional principles derived from Supreme Court jurisprudence which was enunciated in cases involving direct and habeas review of state court proceedings. Such constitutional principles, of course, are fully applicable in the habeas context. *See Yount v. Patton,* 710 F.2d at 977 (Garth, J., concurring in the judgment) (habeas corpus case; explicitly recognizing the standard enunciated in *Davis* as one of several theories which can support a claim of denial of constitutional rights to due process and impartial jury); *Dean v. Israel,* 516 F.Supp. 477, 486–87 (E.D.Wis.) (entertaining claim of inadequate voir dire in habeas context, but holding that state trial court's voir dire and extensive

follow-up voir dire by defense counsel was constitutionally adequate), *rev'd and remanded without opinion,* 720 F.2d 682 (7th Cir.1983); *Allen v. Snow,* 489 F.Supp. 668, 672 (D.Mass. 1980) (recognizing that on habeas review, "[i]n certain circumstances, a trial court's refusal to allow specific questions by counsel on voir dire to inquire into a potential juror's prejudices, biases, and interests has been held to violate due process … [citations omitted]"), *aff'd,* 635 F.2d 12 (1st Cir.1980), *cert. denied,* 451 U.S. 910, 101 S.Ct. 1981, 68 L.Ed.2d 299 (1981); *see also United States v. Chagra,* 669 F.2d 241, 249–55 (5th Cir.1982) (in direct review case, explicitly recognizing *Davis* formulation as one of three constitutional theories by which an accused "can obtain a reversal of his conviction because of pretrial publicity …" (at pages 249 and 253–54); and distinguishing these constitutional theories from relief rendered under the court's supervisory powers (at pages 254–55)).

ter and extent to raise a real probability that veniremen have heard and -formed opinions about events relevant to a case, and ... the defense has brought the pre-trial publicity to the court's attention and requested voir dire inquiry, the court must make inquiry adequate to determine whether anyone has read or heard about the facts, and, if so, what the impact has been on his ability to serve as an impartial juror"); *Silverthorne v. United States,* 400 F.2d 627, 635–44 (9th Cir.1968); *cf. United States v. Haldeman,* 559 F.2d 31, 64–71 (D.C.Cir.1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *Wansley v. Slayton,* 487 F.2d at 96 & n. 20 (comparing extensive voir dire which court held to be constitutionally adequate with voir dire in *United States v. Dellinger* [cited *supra* ] which was held by the Seventh Circuit to be constitutionally inadequate to unearth potential juror bias).

We now apply the legal principles discussed above to the facts of this case. The trial court permitted an extensive voir dire of potential jurors prior to the weekend of the protest march. Jordan maintains, nevertheless, that because the trial court did not permit certain lines of questioning, that the voir dire prior to the protest march was inadequate to ascertain juror bias. We need not reach this issue. As our discussion above indicates, there was extensive publicity surrounding the protest march on the weekend prior to trial. Part of the mission of the protestors and, certainly, part of the emphasis of the news coverage, concerned the trials of Jordan and his co-indictees. Moreover, even to the extent that the publicity did not directly relate to the Jordan case, it would be naive to underestimate its significance in the con-text of the trial. As our review of the pre-trial publicity, the racial tensions at GSP-Reidsville and the relationship of the community to the prison all indicate, we cannot blind ourselves to the significant racial overtones in the news media coverage of the riot and subsequent indictments, and in the protest march and the concomitant counter-protests. At the least, there was a "significant possibility of prejudice" which arose from the coverage of the protest and the protest itself when coupled with all that had come before it. The potential for prejudice was certainly greater than that which occurred in the *Davis* case. *Compare also Silverthorne,* 400 F.2d 627.

The state argues that there was no significant possibility of prejudice in this case because we cannot presume that the jurors disobeyed the court's instructions. First, we note that the activities of juror Sykes were in flagrant violation of the court's instructions. We do not mean to suggest that other jurors became involved in the same type of activities as did Sykes. However, we note that juror Monroe, who was not excused for "cause" by the trial court,[16] put herself in a position where she could be prejudiced by events occurring in the community. Nevertheless, Monroe's actions were arguably not in violation of the court's instructions. Other jurors, interpreting the court's instructions as apparently Monroe did, may also have exposed themselves to potential prejudice. Finally, the barrage of inflammatory publicity over the weekend was so extensive that potential jurors may well have been affected even if they were attempting to follow the court's instructions. In this regard, the case of *United States v. Herring,* 568 F.2d 1099 (5th Cir.1978), is instructive.[17] In *Herring,* the defendant, charged with viola-

**16.** We do not reach the question whether Monroe should have been excused for "cause" by the trial court.

**17.** We note that the *Herring* case was decided under the appellate court's supervisory powers over federal district courts. *United States v. Herring,* 568 F.2d 1099, 1105 (5th Cir.1978). The court explicitly stated that the case did not involve "publicity so pervasive and expressly prejudicial" to require reversal under the "pre-sumed prejudice" standard. *See id.* at 1103 (citing *Sheppard, Irvin, Estes,* and *Rideau* ). Thus, the case did not "call for full-blown due process analysis ...." *Id.* Nevertheless, the *Herring* court stated that it "would not foreclose ... use of [the due process] decisions in reviewing the district court's action after the publicity was brought to its attention." *Id.* The court's partial reliance on those decisions is apparent. *See id.* at 1104 & n. 14, 1105 & n. 15.

tions of federal drug laws, was at one time a road manager for Gregg Allman, a prominent rock musician with "a penchant for attracting substantial national publicity." *Id.* at 1100. There was extensive pre-trial publicity because it was known that the federal grand jury in Macon, Georgia, was investigating possible drug charges involving Allman. As the trial began, publicity intensified especially in Macon, Allman's home town and the site of the trial. On the first day of trial, Allman took the stand and gave testimony very damaging to the defendant. *Id.* at 1101. Two days later, after the prosecution had rested its case-in-chief but before the defendant presented his case, the leading Macon daily newspaper published a front-page banner headline reading "ALLMAN UNDER HEAVY GUARD" with a subtitle reading "Death Threats Reported." *Id.* at 1102. The newspaper article went on to report that Allman had received death threats and was under round-the-clock protection by United States Marshals.

Defense counsel requested that the court ask if the jurors had read the paper, and if any juror had indicated that he had read the article, to inquire further as to whether it would influence him in any degree in his decision of the case. If any juror were to state that he had been influenced, the defense counsel requested further inquiry as to how it influenced him or how it may have induced prejudgment of the case. *Id.* at 1102. The trial court declined to question the jurors in order to determine the extent of their exposure to the newspaper

article or headline. The trial court relied, in part, on a precautionary instruction it gave just prior to the opening statements of counsel. Although the trial judge's instruction was not as extensive as in Jordan's case, it sounded a similar note. The district court's cautionary instruction "included a directive not to 'pay any attention to anything other than what you hear in the courtroom. There may be things in the newspaper, there may be reports on television, you might hear somebody on the street talking. Just pay no attention to anything outside the courtroom.'" *Id.* at 1101.

Despite the cautionary instruction, the *Herring* court held that the trial court should have examined each juror separately to determine how much contact the jury members had had with the publicity and how much prejudice to the defendant had resulted from that contact, assuming that any contact had occurred. *Id.* at 1106. The court concluded:

> For the present, we are unwilling to speculate on the extent of whatever prejudice existed; the point, however, is that since the district court did not question the jury members in order to ascertain the extent of that prejudice, we would have to speculate to conclude that undue prejudice did not exist. In the interest of justice, we must give the defendant the benefit of the doubt in this connection.
>
> *Id.*

Here, as in *Herring*, the trial judge refused unequivocally to inquire as to wheth-

---

We recognize that *Herring* is not constitutional precedent fully applicable in habeas review of a state court conviction. However, we have already indicated that the analysis in *United States v. Davis* is fully applicable in the habeas context, *see supra* note 15; thus, we believe that *Herring* is useful in illustrating the principles enunciated in *Davis* in a factual context analogous to that in the instant case. In this regard, it is important to note that *Herring* enunciates a standard similar to the standard endorsed by *Davis*. The trial court first should determine whether the publicity raised serious questions of possible prejudice. *Herring*, 568 F.2d at 1104–05. If it does, the court should begin inquiry, and

> ... should be confined at first to the issue whether any jurors have actually been ex-

posed to the damaging material. If any have, they should be further questioned to determine the extent of that exposure and its effects on their ability to render an impartial verdict.

*Id.* at 1105; *see also id.* at 1105 n. 15 (noting that jurors' assurances of impartiality in light of exposure to potentially prejudicial material are not always dispositive, citing *Irvin v. Dowd*). Thus, it is clear that *Herring*, like *Davis*, was concerned with a situation involving a substantial potential for prejudice plus inadequate voir dire. Finally, it is interesting to note that *Herring* was decided approximately 8 months prior to *Davis*, and thus did not benefit from the *Davis* court's analysis which had placed the issue fully in a constitutional context.

er jurors had been exposed. The voir dire engaged in after the events of the weekend in the instant case was not merely inadequate, it was nonexistent. We recognize that the trial judge agreed to propound questions to the panel as a whole "couched in the language of the statutory questions." As we have indicated, we assume without deciding that Jordan waived his right to have such questions asked. Therefore, for purpose of analysis, we must assume that the statutory questions were propounded. However, the statutory questions would have been inadequate under the principles of *Davis*.

The statutory questions which the trial judge agreed to ask read as follows: (1) "Have you, for any reason, formed and expressed any opinion in regard to the guilt or innocence of the accused?"; (2) "Have you prejudice or bias resting on your mind either for or against the accused?"; and (3) "Is your mind perfectly impartial between the state and the accused?" *See* Ga.Code Ann. § 15–12–164(a)(1)–(3).

These questions could not have elicited responses relevant to whether the potential jurors had been exposed to the events of the preceding weekend. Jurors who might have been exposed to the demonstration and the accompanying media publicity could have sincerely answered "no" to the conclusory statutory questions quoted above. Surely, a defendant's right to an impartial jury would be violated if someone such as juror Sykes had sat on Jordan's jury, even if such a juror had responded "no" to each and every statutory question.[18] In fact, it was this same type of conclusory protestation of impartiality that the Court in *Irvin* found improbable in light of pre-trial publicity and the jurors' other statements on voir dire. *See Irvin*, 366 U.S. at 724–25 & n. 4, 727–28, 81 S.Ct. at 1643–44 & n. 4, 1645–46.[19]

The case law requires, at the least, that where there exists a significant possibility of prejudice the jurors must in the first instance be questioned as to whether they were exposed. Further inquiry as to the nature of the exposure is then undertaken, if necessary. The trial judge explicitly denied defense counsel's request for such inquiries.

In light of the foregoing, we hold that the voir dire procedures were inadequate to protect Jordan's rights to an impartial jury and due process under the Sixth and Fourteenth Amendments. After the events of the weekend prior to Jordan's trial, the jurors remaining in the jury pool

**18.** The reason the court cannot rely on conclusory statements by jurors of their impartiality is apparent. In situations where the community is inflamed, "[t]he juror is poorly placed to make a determination as to his own impartiality." *Davis*, 583 F.2d at 197; *see also Murphy v. Florida*, 421 U.S. 794, 803, 95 S.Ct. 2031, 2037, 44 L.Ed.2d 589 (1975) ("In a community where most veniremen will admit to a disqualifying prejudice, the reliability of the others' protestations [of impartiality] may be drawn into question; for it is then more probable that they are part of a community deeply hostile to the accused, and more likely that they may unwittingly have been influenced by it"); *Irvin v. Dowd*, 366 U.S. 717, 728, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751 (1961); *United States v. Williams*, 523 F.2d 1203, 1209 n. 10 (5th Cir.1975) ("continual protestations of impartiality from prospective jurors are best met with a healthy skepticism ...").

It is interesting to note in this regard that both jurors Sykes and Monroe were originally qualified by the trial court after conclusory allegations of impartiality, overruling defense counsel's motions to excuse them for "cause."

**19.** Another potential defect in the trial court's offer to propound only the statutory questions is that such questions were to be propounded to the jury panel as a whole. The courts have indicated that general inquiries as to impartiality, when directed to the group as a whole, are unlikely to elicit admissions of partiality. As the Court in *Irvin* put it: "No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration *before one's fellows* is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight." *Irvin*, 366 U.S. at 728, 81 S.Ct. at 1645 (emphasis added); *cf. Patton v. Yount*, 467 U.S. at —— n. 10, 104 S.Ct. at 2890 n. 10, 81 L.Ed.2d at 856 n. 10 ("The only significant difference in the procedures followed here and in *Irvin* is that the veniremen here were brought into the courtroom alone for questioning, while it appears that those in *Irvin* were questioned in front of all those remaining in the panel. This is not an insubstantial distinction, as the Court suggested in *Irvin*, ... but we do not find it controlling").

were subject to a significant possibility of prejudice while at the same time Jordan was not given an opportunity to uncover such prejudice. Therefore, Jordan must be afforded a new trial.[20]

## II. OTHER ISSUES

### A. *Governmental Misconduct.*

Jordan and five other co-indictees filed a pre-trial motion to dismiss their indictments because of governmental misconduct. *See* Respondent's Exhibit 8, vol. 1 at 57–62. This motion was denied. Jordan renewed this claim in his motion for new trial which was also denied. Jordan pressed this claim in the Georgia Supreme Court and to the habeas court below, both times to no avail.

The trial judge did not permit Jordan to present evidence with respect to this claim, but allowed him to make an offer of proof for purposes of appeal. Basically, Jordan claims that the state engaged in numerous illegal acts including administering beatings to his co-indictees and to prospective inmate witnesses in the aftermath of the riot. He also alleges that prison and other governmental authorities manipulated the media in a manner detrimental to himself and his co-indictees; in particular, Jordan alleges that the media manipulation was intended to engender and perpetuate racist feelings in the community against the black inmates indicted in the aftermath of the riot.

In light of our disposition of the case, we need not reach the merits of this claim.

### B. *Failure of State to Grant Prison Transfers to Inmate Witnesses to Testify on Jordan's Behalf.*

Jordan claims that his constitutional rights to compulsory process and due pro-cess were denied because the trial court denied his motion which would have granted transfers to inmates from GSP-Reidsville who would testify in Jordan's behalf. Apparently, the state did transfer inmates who testified for the prosecution. Jordan alleges that four inmates feared for their security if they testified for Jordan and, therefore, did not do so. We are satisfied that we need not reach this question. We have granted relief on one of Jordan's jury claims, *see supra* Part I, and believe that in the seven year period since Jordan's trial the location and availability of witnesses who testified or might have testified in the first trial have probably significantly changed. Any ruling we might make on this claim would not affect the interests of the parties and, therefore, we decline to so rule.

### C. *Use of Peremptory Challenges to Insure an All White Jury.*

Jordan claims that his right under the Sixth Amendment to a jury composed of a fair cross-section of the community was denied by the state's exercise of peremptory challenges against each and every potential black juror. The case was tried before an all white jury. *See* Respondent's Exhibit 2, vol. 5 at 866. Since 1964, the appropriate analysis for such a claim has been that articulated in *Swain v. Alabama,* 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), which held that the use of peremptory challenges in any given case against potential black jurors to gain an all white jury was not a denial of equal protection, in the absence of a showing that the prosecutor was responsible for removing blacks in

---

**20.** As indicated in the text, *supra,* we do not reach Jordan's general claim for change of venue under the "presumed prejudice" standard of *Rideau v. Louisiana,* 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963), and its progeny. We note that the "presumed prejudice" standard is a very stringent one which is difficult to meet, *see generally, Patton v. Yount,* 467 U.S. ——, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), because it is assumed that pre-trial publicity, even if severe and inflammatory, can ordinarily be effectively negated by a searching voir dire. In any event, we recognize that upon retrial the situation in Tattnall County some seven years later will likely be much less inflamed. *See id.* at ——, 104 S.Ct. at 2891, 81 L.Ed.2d at 856 ("it is clear that the passage of time between a first and a second trial can be a highly relevant fact. In the circumstances of this case, we hold that it clearly rebuts any presumption of partiality or prejudice that existed at the time of the initial trial").

"case after case" from each petit jury assembled in the county. *Id.* at 223–24, 85 S.Ct. at 837–38. Recently, however, five members of the Supreme Court have expressed some doubt about the continuing vitality of *Swain* in statements accompanying a denial of a petition for writ of certiorari. *See McCray v. New York*, 461 U.S. 961, 103 S.Ct. 2438, 77 L.Ed.2d 1322 (1983) (opinion of Stephens, J., with whom Blackmun, J. and Powell, J. join, respecting the denial of the petitions for writs of certiorari); *id.* 461 U.S. at 963, 103 S.Ct. at 2439, 77 L.Ed.2d at 1323 (Marshall, J., with whom Brennan, J. joins, dissenting from the denial of certiorari). The Second Circuit has recently noted the above mentioned intimations from the five Justices, limited the *Swain* analysis to the equal protection context and formulated a different analysis for a Sixth Amendment challenge, holding that the deliberate use of peremptory challenges to strike all members of a recognizable group would violate the Sixth Amendment right to a jury composed of a fair cross-section of the community. *See McCray v. Abrams*, 750 F.2d 1113 (2d Cir.1984), *petition for cert. filed*, 53 U.S.L.W. 3671 (U.S. Mar. 4, 1985) (No. 84–1426). The Supreme Court has recently granted certiorari in a case presenting this issue. *See Batson v. Kentucky*, (Ky. Dec. 20, 1984), *cert. granted*, —— U.S. ——, 105 S.Ct. 2111, 85 L.Ed.2d 476 (1985). We need not decide whether the *Swain* test is still the only permissible analysis under the law of this circuit, or whether the foregoing authority permits a differing analysis. It is clear that this claim has been rendered moot by our decision in Part I, *supra.* We cannot assume that the prosecutor will deliberately strike each and every potential black juror when, and if, Jordan is retried. Thus, we decline to address this issue.

## CONCLUSION

In light of the foregoing, we REVERSE the decision of the district court denying habeas relief, and provisionally grant the writ conditioned upon the state's right to retry Jordan within a reasonable time.